**B. J. SEMEL ASSOCIATES, INC., and B. J. Semel d/b/a South East Fireworks, Appellants,**

v.

**UNITED FIREWORKS MANUFACTURING CO., Inc., Appellee.**

**No. 19131.**

United States Court of Appeals District of Columbia Circuit.

Argued June 8, 1965.

Decided Dec. 7, 1965.

Petition for Rehearing En Banc Denied Jan. 19, 1966.

Burger, Circuit Judge, dissented.

Mr. Marshall C. Berger, New York City, a member of the bar of the Court of Appeals of New York, pro hac vice, by special leave of court, for appellants. Mr. Harry E. Taylor, Jr., Washington, D. C., also entered an appearance for appellants.

Mr. James vanR. Springer, Washington, D. C., with whom Mr. James C. McKay, Washington, D. C., was on the brief, for appellee.

Before FAHY, BURGER and McGOWAN, Circuit Judges.

McGOWAN, Circuit Judge:

The appeal before us in this private civil action under the antitrust laws presents solely the question of whether the venue of the action was properly laid in the District Court. This issue turns upon the language of Section 12 of the Clayton Act, 15 U.S.C. § 22, which reads as follows:

> "Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found."

We have concluded that, looking only to those facts as to which there is no essential dispute in the record before us, venue did exist within the meaning of the statute. Thus the order appealed from, which quashed the service of process, is reversed.

I

The complaint in this action alleged violations of the Sherman Act, 15 U.S.C. §§ 1, 2, and 3, as well as illegal price discrimination under the Robinson-Patman Act, 15 U.S.C. § 13(a). Appellant is a District of Columbia corporation with its principal place of business in Washington. It is engaged in the business of distributing fireworks at wholesale, in the District and elsewhere. Appellee is an Ohio corporation which manufactures fireworks and sells them to wholesalers and retailers throughout the United States. Its factory and office are in Dayton. Service of process was effected upon appellee at its Dayton office.

The complaint was met with a motion under Rule 12(b), FED.R.CIV.P., to dismiss for improper venue. An affidavit in support of the motion represented that appellee had no office, property, or personnel in the District of Columbia. It was said that no salesmen, sales agents, or advertising were used in the District to solicit business. Price lists were mailed into the District only upon specific request. Appellee had three customers in the District, including appellant, to whom sales were made pursuant to unsolicited requests received in Dayton. Resulting merchandise deliveries

were all F.O.B. Dayton.[1] Sales to one of the customers other than appellant totalled $1056.23 in 1963 and $1121.50 in 1964. Sales to the other such customer were $643.20 in 1962. Since appellee's organization in 1962, its employees had been in the District on only five occasions. Three of these were in the autumn of 1963 in connection with hearings of a Senate Subcommittee on Juvenile Delinquency. These are said to have involved no solicitations or negotiations, although "these visits [by the President and Affiant Vice-President] included incidental goodwill contacts with customers in the District." The other two visits by affiant in 1964 were said to be "each of less than a day's duration and related solely to this suit and problems arising

out of the assignment by [appellant] to [appellee] of certain accounts receivable as security for payment of the price of merchandise sold to [appellant]."

An opposing affidavit was submitted by an officer of appellant. It recited that appellant bought $69,174.51 worth of fireworks from appellee in 1963, and $97,993.87 in 1964, or a total of $167,-163.88. Two paragraphs [2] describe frequent telephone conversations, "as many as twenty-two a month," concerning "every aspect of [appellant's] business, including advertising, promotion, defective merchandise, deliveries, [and] customers' complaints." Appellee was said to have "insisted" upon an assignment to it of appellant's accounts receivable

1. In the case of appellant, the affidavit recites that "deliveries of merchandise have been made to [appellant] at United's factory in Dayton, with transportation arranged entirely by [appellant]." If this is thought somehow to take these deliveries outside of what are customarily referred to as F.O.B. shipments, then that would be an essential element in a claim that appellee had so tailored and restricted its operations as not to be in interstate commerce at all, thereby being beyond the reach of the federal antitrust laws. But appellee's counsel, whose knowledge of the true nature of appellee's operations may reasonably be inferred to be as realistic as it is complete, has made no such claim. It is still possible, by careful restriction of one's activities, to do business solely in intrastate commerce if one wants to, even with buyers who come from out of the state. But if the business choice is to seek the benefits of the greater latitude provided by operations within the contemplation of the Commerce Clause, then one of the burdens is amenability to federal antitrust sanctions, including the liberalized venue requirements of Section 12.

2. "During the entire period of the relationship between plaintiffs and defendant, defendant and I were in continual communications. Sometimes these communications were made through my visiting defendant's plan in Dayton, Ohio. Usually, they were made by long distance telephone conversations between Dayton and my office in Washington. There would be as many as twenty-two telephone conversations a month between defendant

and plaintiffs. Most significantly, these communications have taken place in the District of Columbia. Mr. Martin in Paragraph 6 of his affidavit, admits that on three different occasions in 1963, he visited the District of Columbia. He dismissed these trips, however, as made solely in connection with hearings held by the United States Senate Sub-Committee on Juvenile Delinquency. Everything else he did during his visits was brushed aside as 'incidental good will contacts with customers.' What he calls 'incidental good will contacts' were, in fact, important business sessions lasting approximately 3 to 4 hours at least. These sessions handled the major problems that had to be dealt with on a person to person basis rather than over the telephone, the problems which arise particularly in preparation for a new season in the fireworks industry. As a result of these sessions, I was able to avoid making at least one trip to Dayton, which I normally would have had to make."

"The constant communications between defendant and myself concerned every aspect of plaintiff's business. Defendant insisted that it obtain an assignment of my accounts from my customers, most of whom were located in the District of Columbia, in order to secure my own account with defendant. Likewise, I was in constant touch with defendant about such things as advertising, promotion, defective merchandise, deliveries, customers' complaints, and all the other numerous matters that would naturally arise out of almost a $100,000 worth of business a year."

generated by appellant's resales of appellee's products.

It will be noted that this last-mentioned affidavit gave a different version of the "goodwill" calls admittedly paid by appellee's officers upon appellant in 1963. This prompted the filing of a further affidavit by the movant, denying appellant's description of these meetings and insisting that they involved no business discussions other than generalized goodwill exchanges.

The motion was heard and disposed of by the District Court solely on these affidavits, together with legal memoranda and oral argument by the parties. The court's order recited no more than that "having found that venue is improperly laid as to the defendant in the District of Columbia," service is quashed.

## II

■ Putting to one side the clash between the affidavits as to what occurred during the 1963 calls of appellee's officers upon appellant in Washington,[3] certain facts emerge as not in dispute. One is that the volume of sales made by appellee to appellant was substantial. Billings of the order of $70,000 to $100,000 annually are not insignificant in most businesses, and certainly there is nothing in this record to suggest that they are so in the fireworks trade. A second is that appellant and appellee were in constant and frequent telephonic communication about all aspects of their business relationships, including appellant's own relations with its customers—a circumstance of active interest to appellee because of its practice of requiring assignment to it of appellant's receivables.

It seems equally clear that appellee had no permanent base or personnel in the District; that it relied heavily, if not entirely, on the telephone for the provision of those services which a travelling salesman or a local agent would otherwise have been expected to supply; and that it uniformly adhered to a trade policy of shipping its products F.O.B.

■■ In trying to relate these facts to the governing law, it is important to remember that we are interpreting a venue statute, not resolving a constitutional objection to the assertion of jurisdiction. Compare International Shoe Co. v. State of Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). Furthermore, the venue statute with which we deal is not generalized in its reach but was intended by Congress to be an important facet in the scheme of private remedies devised to promote the objectives of the antitrust laws.[4] Thus it is that the lore of the myriad cases dealing with the familiar problem of the requisite indicia of corporate presence to render the foreign corporation subject to suit locally is not directly apposite here.[5]

---

3. The District Judge did not address himself in any manner to this apparent conflict, nor purport to make findings of fact generally as, indeed, he is not required to do in deciding motions under Rule 12. See Rule 52(a), FED.R.CIV.P. Appellee has cast its argument here largely in terms of a claim that we are bound by Rule 52(a) not to disregard the trial court's findings of fact unless they are clearly erroneous. We find this approach wholly unpersuasive. The raising of the defense of improper venue by a motion to dismiss in advance of trial is expressly made optional with the pleader by Rule 12(b). If deferred to the answer, evidence relevant to venue will be heard by the trier of fact and findings made, if the judge is the trier, which would presumably resolve conflicts. In this posture Rule 52(a) would be relevant.

4. See note 6, *infra.*

5. It is significant, on the one hand, that Section 12, in addition to laying venue in the districts where a corporation is "an inhabitant" or "may be found," does the same for any district wherein it "transacts business"; and, on the other, that the concluding clause authorizes service of process only in a district where the corporation is "an inhabitant" or "may be found." Because the omission of "transacts business" from the last clause suggests that the content of that phrase differs from that of the other two categories, it has been recognized that venue might exist in one district with process required to be served in another. See Eastman Kodak Co. of New York v. Southern Photo Materials Co., 273 U.S. 359, 373, 47 S.Ct. 400, 71 L.Ed. 684

The Supreme Court has pointedly reminded us of the inutility of much of this learning in construing Section 12 of the Clayton Act, and has said that we are, as has it, to seek to make effective "Congress' remedial purpose" in enacting that statute by making "the test of venue" under it a "practical, everyday business or commercial concept of doing or carrying on business 'of any substantial character' * * *." United States v. Scophony Corp., 333 U.S. 795, 807–808, 68 S.Ct. 855, 862, 92 L.Ed. 1091 (1948). The remedial purpose referred to in *Scophony* was clearly that identified by the Court as the relieving of "persons injured through corporate violations of the antitrust laws from the 'often insuperable obstacle' of resorting to distant forums for redress of wrongs done in the places of their business or residence." [6]

*Scophony* does not decide this case, but it does provide an authoritative characterization of the purposes of Section 12 and of the considerations relevant to the realization of those purposes. Since this exegesis was provided in 1948, a number of courts have made their way by the light it provides. Green v. U. S. Chewing Gum Mfg. Co., 224 F.2d 369 (5th Cir. 1955); Brandt v. Renfield Importers, Ltd., 278 F.2d 904 (8th Cir.), cert. denied, 364 U.S. 911, 81 S.Ct. 274, 5 L.Ed.2d 226 (1960); Lower Colorado River Authority v. Westinghouse Electric Corp., 219 F.Supp. 743 (W.D.Tex.1963). In one way or another it is possible, as appellee does, to note factual variations from this case, but appellee's chief reliance in this regard is upon the circumstance that deliveries of the goods sold were, in these cases, made for the seller's account to the buyer's place of business. We, however, are unable to believe that the spirit of *Scophony* comports with allowing the seller's shipping practices to determine his amenability to suit under

(1927); 1 MOORE, FEDERAL PRACTICE ¶ 0.144 [15] at 1668–70 (2d ed. 1964). See also, 51 CONG.REC. 9608. Thus, considerations resting upon the likelihood of actual notice (i.e. the presence of employees or agents), which are relevant to the requirements for service of process, need not control here.

6. As originally proposed, the provision which is now Section 12 of the Clayton Act merely repeated the language of Section 7 of the Sherman Act, which provided that suits against a corporation could be brought only in the district where the corporation is an "inhabitant" or "may be found." H.R.REP. No. 627, 63d CONG., 2d SESS. 20 (1914). Fearful that this provision was too restrictive and placed plaintiffs at an undue disadvantage, see 51 CONG.REC. 9414–9417, 9466–9467, 9607–9608, the House, in a deliberate effort to ease the difficulties of bringing suit, amended the provision by adding "or has an agent." 51 CONG.REC. 9466, 9607. The Senate Judiciary Committee discarded the House version and proposed amending that section to it present form. S.REP. No. 698, 63d CONG., 2d SESS. 73 (1914). The Senate accepted the change without comment, see 51 CONG.REC. 14,-214, 14,324, 14,597, 14,609–6910, and it attracted little attention until the Bill finally returned to the House from the Conference Committee. In the House, Congressman Webb, the manager of the Bill in the Conference Committee, pointed to Section 12 as part of his defense against criticism that the compromise Bill was too weak. After emphasizing the civil remedies provided by the Bill, he stated that by this section "we are liberalizing the procedure in the courts in order to give the individual who is damaged the right to get his damages anywhere—anywhere you can catch the offender * * *." 51 CONG.REC. 16274. And he added, immediately before approval of the Conference report, "we have thrown the doors of the court wide open for the first time to every man who is injured. He can enter the court at his home and sue a man or corporation who injures him or enter suit in the man's or corporation's home * * *." 51 CONG.REC. 16342. Thus, although Congress perhaps did not adopt the most liberal version of the section proposed, see United States v. National City Lines, Inc., 334 U.S. 573, 68 S.Ct. 1169, 92 L.Ed. 1584 (1948), there is no doubt that the version enacted represented a conscious attempt to liberalize the venue requirements. See also, Eastman Kodak Co. of New York v. Southern Photo Materials Co., 273 U.S. 359, 372–374, 47 S.Ct. 400, 71 L.Ed. 684 (1927); 1 MOORE, FEDERAL PRACTICE ¶ 0.144 [15] at 1667 (2d ed. 1964); *Note*, 58 YALE L.J. 482 (1949).

Section 12. Were it otherwise, F.O.B. would always, and without more, compel the buyer to litigate on the seller's home grounds—the very result which Congress sought to avoid in Section 12.[7]

One thing at least which does emerge from the post-*Scophony* cases, it seems to us, is a substantiality requirement in terms of the volume of trade done.[8] Venue is not to be found in every case simply because of an isolated transaction of modest proportions. "Transacts business," as used in the statute, imports continuity—and continuity and total volume tend to be inter-acting. As said above, we think the volume of business was such here as to surmount any attack of a *de minimis* nature. And the wholly respectable proportions of this volume complete the picture which we think the record paints of a manufacturer who looked to the District of Columbia as one of its important markets and whose contacts with that market, although physically remote in a sense, were nonetheless continuous and substantial. No more than the shipping device of F.O.B. do we think the telephone capable of insulating its user under any and all circumstances from the reach of Section 12. Whatever may be the final verdict as to the net contribution of that instrument to civilized intercourse, it certainly has wrought changes in the necessities of doing business at far removes. The "drummers" of an earlier time have, in some lines at least, become as obsolete as the forms of transportation they had to use.

7. See Sunbury Wire Rope Mfg. Co. v. United States Steel Corp., 129 F.Supp. 425 (E.D.Pa.1955). There the court first found venue to exist on a showing that the seller had in two years sold and delivered some $600,000 worth of its products in the jurisdiction. On petition for rehearing it was pointed out that the shipments were on an F.O.B. basis, with title having passed from seller to buyer before the goods entered the jurisdiction allegedly having venue. The court adhered to its original decision, stating that passage-of-title concepts and consequences were not comprehended within the practical concept of transacting business embodied in Section 12. We agree.

Intermountain Ford Tractor Sales Co. v. Massey-Ferguson Ltd., 210 F.Supp. 930 (D.Utah 1962), involved a claim of venue in respect of a Canadian parent corporation by reason of its relationships with an American subsidiary. The court appeared to think that the claim turned upon a proper reading of Cannon Mfg. Co. v. Cudahy Packing Co., 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634 (1925). But *Cudahy* did not involve either the antitrust laws generally or Section 12 in particular. It was an action for breach of contract, and the question was whether a foreign corporation parent was doing business in North Carolina through its subsidiary so as to be subject to suit there. Judge Christensen's preoccupation with *Cudahy* is evidenced by the fact that he closed the paragraph quoted in the dissent with the sentence: "And besides, as I read the *Cudahy* case a similar argument was rejected there." The significance of F.O.B. sales in measuring due process limitations on state jurisdiction is surely not to be equated with their relevance to defining a venue created by Congress as an incident to the assertion, in the form of the antitrust laws, of its plenary Commerce Clause power. The so-called "'long-arm' concept," since it relates to the reach of state jurisdiction, is not normally to be thought of as extended by a construction of a Congressional venue statute deriving from the Commerce Clause. In any event, it is interesting that Judge Christensen eventually found Section 12 venue to exist in the *Intermountain* case, because he thought the parent-subsidiary problem of *Cudahy*, where it was held that North Carolina did not have jurisdiction over the defendant's person, should be broadly viewed in the light of what the Supreme Court had later said in *Scophony* about the liberalized scope of Section 12.

8. Commonwealth Edison Co. v. Federal Pacific Electric Co., 208 F.Supp. 936 (N.D.Ill., 1962). And see Ohio-Midland Light & Power Co. v. Ohio Brass Co., 221 F.Supp. 405 (S.D.Ohio 1962); Public Service Co. v. Federal Pacific Electric Co., 210 F.Supp. 1 (D.N.M.1962); Reid v. University of Minnesota, 107 F.Supp. 439 (N.D.Ohio 1952). What number of dollars is necessary to found venue is, obviously, a highly relative concept which takes shape from other factors in the particular setting. Cf. Donlan v. Carvel, 193 F.Supp. 246 (D.Md.1961).

Had an officer of appellee suddenly been asked, in a non-legal context, "Are you doing any business in the District of Columbia," his answer would, we surmise, have been "Yes." His interrogator would understand him to mean that at least one customer in the District was looked to for an important amount of purchases; and, the more practical a man of business such an interrogator was, the more he would have assumed that appellee was in close and continuous touch with such customer about their mutual business concerns. This is what Congress had in mind when it pondered the problem of venue in relation to private antitrust suits, and decided to give the injured party wider scope to sue at home.[9] See United States v. Scophony Corp., *supra.* The exact limits of that scope may not be clearly fixed, but we think this appellee had, on the basis of the record before us, brought himself within them.

The judgment appealed from is reversed and the case remanded for further proceedings not inconsistent herewith.

It is so ordered.

BURGER, Circuit Judge (dissenting):

The majority stretches the "longarm" concept beyond both the statute and reasonable need. Neither the language relied on nor its history furnishes a basis for finding venue proper here. I therefore respectfully dissent.

The statute we are called upon to construe provides, "Any suit, action or proceeding under the antitrust laws against a corporation may be brought * * * in any district wherein it may be found or transacts business * * *." Clayton Act § 12, 38 Stat. 736, 15 U.S.C. § 22 (1964).

The majority holding rests on two "contacts" of United Fireworks Mfg. Co. with the District of Columbia. First, it points to the "substantial" volume of sales by United to Semel, a District of Columbia corporation. The majority stresses these sales but the affidavit of appellant's General Manager is undisputed that all negotiations leading up to these sales and all deliveries of merchandise took place in Dayton, Ohio. Moreover, these deliveries were not just ordinary F.O.B. shipments, with the seller arranging for shipment, or at least transporting the goods to the shipping firm depot, and the buyer merely paying the costs, as the majority opinion seems to suggest. United did not transport or arrange transportation of the goods from its own plant in Dayton; Semel made all arrangements for shipment from that point. The only other "contact" the majority finds with the District is telephone conversations between United's officers in Dayton and Semel employees in Washington. The majority relies on these tenuous "contacts"[1] to show that United "transacts business" in Washington, D. C., in the face of undisputed evidence that it has no agents here, and

---

9. This is not to say that Congress intended that every case must be tried where it is first brought. The district courts have been expressly empowered to transfer civil cases for "the convenience of parties and witnesses, in the interests of justice." 28 U.S.C. § 1404(a). This has been held to apply to civil antitrust cases, whether instituted by the Government or by a private party. United States v. National City Lines, Inc., 337 U.S. 78, 69 S.Ct. 955, 93 L.Ed. 1226 (1949); Paramount Pictures, Inc., v. Rodney, 186 F.2d 111 (3d Cir.) cert. denied, 340 U.S. 953, 71 S.Ct. 572, 95 L.Ed. 687 (1951). Thus a determination that venue exists under Section 12 does not conclude the

disposition of a motion to transfer under Section 1404(a).

1. Two other D.C. customers purchased a total of $2820.93 worth of goods. In addition, employees of appellee made five visits to the District of Columbia none for the purpose of sales; two of them were in connection with this litigation, and three were in connection with hearings of the Senate Subcommittee on Juvenile Delinquency. United received an assignment of accounts receivable from appellant. The majority correctly refuses to rely to any extent on these even more tenuous "contacts." *Cf.*, Fandel v. Arabian American Oil Co., 120 U.S. App.D.C. 193, 345 F.2d 87 (1965).

has never solicited business or advertised its products here. Price lists have been mailed into the District only when requested by prospective customers.

Section 12 authorizes suit "in any district *wherein* [a corporate defendant] * * * transacts business * * *." (Emphasis added.) In holding that venue is proper merely on the basis of "contacts" such as those described above, the majority bypasses the crucial word "wherein." As I read it, the statute contemplates venue when business is transacted *in* this jurisdiction, not in Ohio *with persons in* Washington. A golf ball sometimes circles the cup, in "contact" with the goal, but it is not *in* unless it enters physically. I cannot stretch the simple words of the statute to cover sales negotiated outside the District of Columbia and delivered outside the District under every sense in which the word "delivered" can be employed, especially the common meaning. United would have fulfilled these contracts even if the fireworks had never reached the District of Columbia but had been transported elsewhere, which appellant was free to do. The eventual destination of the goods is hardly more relevant to finding transaction of business than fruits of a search are to finding it valid. The majority claim that the telephone calls demonstrate commercial concern and thus bring United *within* the District. Yet it is hard for me to understand how these calls, which did not involve solicitation of business or contract negotiations, can be said to have brought appellee's business "of any substantial character" into the District of Columbia. While these communications reached a frequency of 22 a month during the peak season, they may have fallen off to one or even none in other months. Indeed the record does not show that United initiated a single telephone call to Semel, and if this is the fact, Semel would surely

have shown it. I cannot read Section 12 as enabling a person to subject a corporation to suit in a foreign jurisdiction by purchasing the corporation's products at its home, then going into the foreign jurisdiction and making some telephone calls to the seller.

The statutory history reveals little. The only evidence of intent which can be gleaned from the congressional debates is a broad purpose to expand venue beyond that authorized in Section 7 of the Sherman Act, 26 Stat. 210. Indeed, the members of the House of Representatives who debated this section seem to have been quite unclear even on the meaning of the Sherman Act provision. See, *e. g.*, 51 Cong.Rec. 9414–9417 (1914). Yet this broad purpose can hardly help us in deciding a specific case of venue. It clearly does not carry to the logical extreme of allowing suit wherever an injured party resides or decides to bring his suit, for Congress rejected that alternative when it was proposed by some members. See, *e. g.*, 51 Cong.Rec. 9146 (remarks of Representative Cullop), 9466 (remarks of Representative Dickinson), 9467 (remarks of Representative Sumners), 9607–9608 (remarks of Representative Sumners) (1914). I must respectfully suggest that the intent of Congress cannot turn on an absurdly sweeping speech of one of the 531 members of Congress that the venue provision allows suit almost anywhere including the purchaser's home jurisdiction. If the statute said or implied this, the majority would not need to strain so valiantly to find "contacts." The legislative history simply does not lead to the result reached by the majority.[2]

The majority relies largely on cases in other circuits construing Section 12. Yet it can point to only two District Court decisions sustaining venue on the basis of "contacts" even remotely as skimpy as those in the present case. Those two

2. See generally United States v. National City Lines, 334 U.S. 573, 582–588, 68 S.Ct. 1169, 92 L.Ed. 1584 (1948). When, as, and if Congress wants to allow suits under the Clayton Act at the plaintiff's

"home base," it has adequate staff facilities to articulate that concept in a few simple words. Until it does, we have no basis legislating it because of a speech on the floor of Congress.

cases, Lower Colorado River Authority v. Westinghouse Elec. Corp., 219 F.Supp. 743 (W.D.Tex.1963), and Sunbury Wire Rope Mfg. Co. v. United States Steel Corp., 129 F.Supp. 425 (Ed.D.Pa.1955), would indeed support the majority's conclusion if it were not for the fact that the deliveries here were not merely F. O.B. but took place in every known sense in Dayton, Ohio, with appellant not only paying for but even arranging for shipment from appellee's plant.

The majority stresses the Supreme Court cases of United States v. Scophony Corp., 333 U.S. 795, 68 S.Ct. 855, 92 L. Ed. 1091 (1948), and Eastman Kodak Co. of New York v. Southern Photo Materials Co., 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684 (1926), while acknowledging that on the facts of those cases they are not in point. All the Supreme Court has told us is to use common sense in interpreting "transacts business": " 'a corporation is engaged in transacting business in a district * * * if *in fact, in the ordinary and usual sense,* it "transacts business" therein *of any substantial character.' "* Scophony, 333 U.S. at 807, 68 S.Ct. at 861, quoting *Eastman Kodak,* 273 U.S. at 373, 47 S. Ct. at 403. (Emphasis added by the Supreme Court in *Scophony.*) Under *Eastman Kodak* "[t]he practical, everyday business or commercial concept of doing or carrying on business 'of any substantial character' became the test of venue." *Scophony,* 333 U.S. at 807, 68 S. Ct. at 862.

The majority also cites two Courts of Appeals cases which cite *Sunbury Wire Rope Mfg. Co., supra.* Yet neither of those cases embodies "contacts" as fragile as those in the case before us. In Brandt v. Renfield Importers, Ltd., 278 F.2d 904 (8th Cir. 1960), the Court of

Appeals for the Eighth Circuit held that venue was properly laid as to all three liquor company defendants in the Eastern District of Missouri. This holding was based largely upon the facts that the distillers had taken out Missouri Outstate Liquor Solicitor's Licenses and they had each "selected *sole and exclusive distributors* who apparently perform for the [distillers] * * * every function of distributing [their] * * * products that agents hired and paid for the purpose could accomplish." *Id.* at 910. (Emphasis added.) The sole and exclusive distributorships carried with them careful planning by the distillers of advertising in the exclusive territory. In Green v. U. S. Chewing Gum Mfg. Co., 224 F.2d 369 (5th Cir. 1955), the Court of Appeals for the Fifth Circuit held venue was proper in a district *into* which the defendant sold *and delivered* a large amount of ball chewing gum to at least two regular customers.[3] The complaint alleged that the defendant had conspired with distributors within the district to divide the area into *exclusive* territories. This exclusivity is vastly more significant than any factor relied on here.

The limits of the expanded venue authorized by Section 12 have been recognized and stated by Judge Christensen in language applicable to our facts:

> Ordinary business practices completely *removed from the local scene* could not be so magnified in their supposed local effect without subjecting almost every foreign manufacturer to the consequences of local operations merely because their products eventually reach local dealers or consumers. The most loose concept of liberalized venue and service requirements would not countenance such result.

3. That the Fifth Circuit itself considers *shipment and delivery into* the district important is shown in the following articulation of its rule by Judge Rives, author of the *Green* opinion: "[T]his Court is committed to the proposition that a corporation doing a purely interstate business, which ships into a judicial district and delivers and sells substantial quantities of its products, 'transacts business' in that district within the meaning of [Section 12] * * *." Hartley & Parker, Inc. v. Florida Beverage Corp., 307 F.2d 916, 918 (5th Cir. 1962).

Intermountain Ford Tractor Sales Co. v. Massey-Ferguson Ltd., 210 F.Supp. 930, 932, (D.Utah 1962). That case involved equipment shipped directly into the local district by the Canadian defendant. The court refused to base venue upon such shipments, because "[t]he evidence clearly indicates that property shipped into Utah by the Canadian company *was sold prior to* shipment * * *." *Ibid.* (Emphasis added.)[4] The great weight of authority before and after *Scophony, supra,* accords with Judge Christensen and supports the District Court's dismissal in the present case. See Ohio-Midland Light & Power Co. v. Ohio Brass Co., 221 F.Supp. 405 (S.D.Ohio 1962); Friedman v. United States Trunk Co., 204 F. Supp. 366 (S.D.N.Y.1962); Friedman v. United States Trunk Co., 30 F.R.D. 148 (S.D.N.Y.1962); Bruner v. Republic Acceptance Corp., 191 F.Supp. 200 (E.D. Ark.1961); Dazian's, Inc. v. Switzer Bros., 111 F.Supp. 648 (N.D.Ohio 1951); Seaboard Terminals Corp. v. Standard Oil Co., 35 F.Supp. 566 (S.D.N.Y.1940); Seaboard Terminals Corp. v. Standard Oil Co., 24 F.Supp. 1018 (S.D.N.Y.1938); *cf.* McManus v. Capital Airlines, 166 F. Supp. 301 (E.D.N.Y.1958); Windsor Theatre Co. v. Loew's, Inc., 79 F.Supp. 871 (D.D.C.1948).

The basic question here is whether a corporation still has the right to restrict its business "transactions" to a chosen geographical area and thus to avoid being subjected to suit in far-away localities.

4. Although *Intermountain Ford, supra,* did involve the question of the propriety of venue as to a parent corporation whose subsidiary did business within the relevant district, as the majority opinion recognizes, the language quoted above was addressed to the contention that venue was proper because "the Canadian corporation was directly doing business in the district of Utah because as shipper it sent goods into the state which were directed not to its subsidiary as the purchaser but to the stores operated by the subsidiary or to other dealers * * *." 210 F.Supp. at 932. Although Judge Christensen found venue proper in *Intermountain Ford,* it was only on the basis of the commingled control between parent corporation and subsidiary, so that

I think it still has that right[5] and I do not see how any seller could go farther to exercise that right than United has done. United simply has not been "transacting business * * * in the ordinary and usual sense" in this jurisdiction.

the Canadian parent corporation exercised "direct control" over the subsidiary's stores within the district of Utah. *Id.* at 938. He held that Cannon Mfg. Co. v. Cudahy Packing Co., 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634 (1925), did not control the facts before him. *Id.* at 937-938.

5. It is not necessary, in order to avoid subjecting oneself to suit in a *particular* foreign state, to limit one's business to purely intrastate operations, as the majority opinion suggests in its footnote 1. Surely not every interstate business is subject to suit under Section 12 in every district into which its products may be carried by others in substantial quantities.