**UNITED STATES of America,
Plaintiff,**

v.

**SMITHFIELD FOODS,
INC., Defendant.**

**No. CIV.A. 03–00434 (HHK).**

United States District Court,
District of Columbia.

Aug. 5, 2004.

---

C. Alexander Hewes, Jr., Jessica K. Delbaum, Nina B. Hale, Caroline E. Laise, Washington, DC, for Plaintiff.

Kevin J. Arquit, Simpson, Thacher & Bartlett LLP, New York City, Thomas Michael Hughes, Hunton & Williams, Washington, DC, Thomas Glascock Slater, Jr., Hunton & Williams, Richmond, VA, for Defendant.

## MEMORANDUM OPINION

KENNEDY, District Judge.

Plaintiff, the United States, brings this action against defendant Smithfield foods, Inc. ("Smithfield") for civil penalties under Section 7A of the Clayton Act, 15 U.S.C. § 18a, commonly known as the Hart–Scott–Rodino Antitrust Improvements Act of 1976. Presently before this court is defendant's motion to dismiss for lack of personal jurisdiction [# 3]. Upon consideration of defendant's motion, the opposition thereto, and the record of this case, the court concludes that this court is unable to exercise personal jurisdiction over defendant and that this case should be transferred to the Eastern District of Virginia.

### I. BACKGROUND

**A. The Hart–Scott–Rodino Antitrust Improvements Act**

At all times pertinent to this suit, the Hart–Scott–Rodino Antitrust Improvements Act (the "Act") required that a per-

son with total assets or annual net sales in excess of $100 million, who as a result of an acquisition, would hold an aggregate total amount of voting securities in excess of $15 million to file a premerger notification and report with the U.S. Department of Justice ("DOJ") and the Federal Trade Commission ("FTC") and to observe a waiting period before making the acquisition, unless otherwise exempted.[1] 15 U.S.C. § 18a(a). The waiting period is intended to provide the FTC and the DOJ with time to investigate the proposed transactions and determine whether to seek an injunction to prevent transactions that may violate the antitrust laws. Acquisitions of voting securities in excess of $15 million are exempt from the reporting and waiting obligations of the Act if they are "solely for purposes of investment" and the voting securities acquired or held do not exceed 10 per cent of the outstanding securities of the issuer. 15 U.S.C. § 18a(c)(9). Any person who violates the Act is liable to the United States for a civil penalty of up to $11,000 per day during which the person is in violation of the Act. 15 U.S.C. § 18a(g)(1), *amended by* Pub.L. No. 101–410, 104 Stat. 890 (1990) (28 U.S.C. § 2461 note), *amended by* Pub.L. No. 104–134, § 31001(s), 110 Stat. 1321 (1996), and 16 C.F.R. § 1.98 (2004).

## B. Smithfield

Smithfield, a Virginia Corporation with its principal executive offices in Smithfield, Virginia, is the nation's largest hog producer and pork packer, reporting annual net sales of over $3 billion during the time of the alleged violations of the Act. On May 19, 1998, Smithfield began acquiring voting securities of IBP, Inc. ("IBP"), a Delaware corporation with its principal executive offices in Dakota Dunes, South Da-

kota. Smithfield made these acquisitions through its wholly-owned subsidiary, SF Investments, Inc. On June 26, 1998, Smithfield acquired additional IBP voting securities. Smithfield continued to acquire IBP voting securities through June 29, 1998. Smithfield held an aggregate total amount of IBP voting securities in excess of $15 million until October 1, 1998 when it began to liquidate its IBP holdings. As the parent entity, Smithfield did not file the premerger notification and report form required by the Act if the purchases were not exempt from filing as solely for investment purposes.

On June 30, 1999, Smithfield again began acquiring IBP voting securities. On December 8, 1999, as a result of its additional acquisitions of IBP voting securities, Smithfield held an aggregate total amount of IBP voting securities in excess of $15 million. Smithfield continued to acquire IBP voting securities through September 11, 2000. On January 5, 2001, Smithfield began to liquidate its IBP holdings, and by January 12, 2001, the value of Smithfield's IBP holdings fell below $15 million. Smithfield did not file the premerger notification and report form that the Act required if the purchases were not exempt from filing as solely for investment purposes.

The United States seeks civil penalties of $11,000 per day during two periods in which Smithfield allegedly violated the Act. Smithfield allegedly violated the Act for a total of 97 days from June 26, 1998 through October 1, 1998 and for a total of 401 days from December 8, 1999 through January 12, 2001.

## C. Smithfield's Lack of Contact with the District of Columbia

At the time of the alleged violations of the Act, Smithfield, a holding company

---

1. On February 1, 2001, an amendment that increased the $15 million amount to $50 million became effective. Pub.L. No. 106–553, 114 Stat. 2762 (Dec. 21, 2000).

that does not manufacture, distribute, or sell any products or commercial services, no longer had any offices or facilities in the District of Columbia. In 1987, Smithfield moved its headquarters to offices leased in the District of Columbia. In 1993, it moved its headquarters back to Smithfield, Virginia, however. Because Smithfield's office lease in the District of Columbia did not expire until 1997, Smithfield sublet the space through April 1997. Due to its subletting activity, Smithfield filed annual corporate reports and paid taxes required by the District of Columbia, filing its last report in July 1998. Since September 2001, Smithfield has also filed a tax form with the District of Columbia pursuant to D.C.Code § 47–1812.08 because one of its employees is a resident of the District of Columbia.

Smithfield's decision to invest in IBP securities was made by executives at its headquarters in Virginia, or at the offices of its investment subsidiary, SF Investments, Inc., a Delaware corporation headquartered in Delaware. The acquisitions of IBP securities were ordered in Virginia or Delaware and executed on the New York Stock Exchange.

Smithfield conducts its operations through two subsidiary operating groups, the Meat Processing Group and the Hog Production Group. The Meat Processing Group consists of separately incorporated meat processing subsidiaries, whose operations are supplied in part by entities within the Hog Production Group. The Hog Production Group is organized under a separately incorporated subsidiary, Murphy–Brown, LLC, a Delaware limited liability corporation headquartered in North Carolina. None of the operating subsidiaries are incorporated or headquartered in the District of Columbia. Products manufactured by some of Smithfield's subsidiaries are sold in retail outlets in the District of Columbia. The United States does not allege, however, that any of these subsidiaries were involved in conduct that allegedly violated the Act.

## II. ANALYSIS

### A. Legal Standard for Motion to Dismiss

A motion to dismiss is appropriate "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Martin v. Ezeagu,* 816 F.Supp. 20, 23 (D.D.C.1993) (internal quotation marks omitted); *see Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (stating that a complaint should not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief"). In addition, the court must "construe the complaint in the light most favorable to [the] plaintiff and must accept as true all reasonable factual inferences drawn from well-pleaded factual allegations." *In re United Mine Workers of Am. Employee Benefit Plans Litig.,* 854 F.Supp. 914, 915 (D.D.C.1994); *see Schuler v. United States,* 617 F.2d 605, 608 (D.C.Cir.1979) (stating that the court must give the plaintiff "the benefit of all inferences that can be derived from the facts alleged").

Generally, in resolving motions to dismiss brought under Rule 12(b)(2), unlike motions brought pursuant to Rule 12(b)(6), courts are free to consider relevant materials outside the pleadings. *Land v. Dollar,* 330 U.S. 731, 735 n. 4, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947) ("When a question of the District Court's jurisdiction is raised, either by a party or by the court on its own motion, ... the court may inquire by affidavits or otherwise, into the facts as they exist."), *overruled on other*

*grounds by Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949); *Artis v. Greenspan*, 223 F.Supp.2d 149, 152 (D.D.C.2002) ("A court may consider material outside of the pleadings in ruling on a motion to dismiss for lack of venue, personal jurisdiction or subject-matter jurisdiction."). Therefore, in considering Smithfield's motion to dismiss on the basis of lack of personal jurisdiction, the court has considered the parties' submissions relevant to this issue.

 The plaintiff bears the burden of proof of establishing personal jurisdiction. *Jacobsen v. Oliver*, 201 F.Supp.2d 93, 104 (D.D.C.2002); *Dooley v. United Techs. Corp.*, 786 F.Supp. 65, 70 (D.D.C.1992); *Lott v. Burning Tree Club, Inc.*, 516 F.Supp. 913, 918 (D.D.C.1980). The plaintiff must make a prima facie showing of personal jurisdiction by alleging specific facts that demonstrate purposeful activity by the defendant in the District of Columbia invoking the benefits and protections of its laws. *First Chicago Int'l v. United Exch. Co.*, 836 F.2d 1375, 1378–79 (D.C.Cir.1988); *Jacobsen*, 201 F.Supp.2d at 104; *Novak–Canzeri v. Saud*, 864 F.Supp. 203, 205 (D.D.C.1994). When personal jurisdiction is challenged, the plaintiff "cannot rest on bare allegations or conclusory statements and must allege specific facts connecting each defendant with the forum." *GTE New Media Servs., Inc. v. Ameritech Corp.*, 21 F.Supp.2d 27, 36 (D.D.C.1998).

## B. Personal Jurisdiction Under the Clayton Act

The United States relies on Section 12 of the Clayton Act, 15 U.S.C. § 22, as the sole basis for this court's exercise of personal jurisdiction over Smithfield.[2] Section 12 of the Clayton Act is essentially a long-arm statute that provides for personal jurisdiction by permitting "service of process in a non-forum district, so long as the venue provision is met." *Chrysler Corp. v. Gen. Motors Corp.*, 589 F.Supp. 1182, 1195 (D.D.C.1984). Section 12 of the Clayton Act provides:

> Any suit, action or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found.

15 U.S.C. § 22. The United States does not attempt to demonstrate that this court has personal jurisdiction over Smithfield by claiming that Smithfield is an "inhabitant" or is "found" in the District of Columbia. Instead, the United States contends that Smithfield transacts business in the District of Columbia through the operations of subsidiaries that Smithfield controls.

 For purposes of Section 12 of the Clayton Act, a defendant transacts business within a district if the business transacted therein is of a substantial character. *Caribe Trailer Sys., Inc. v. Puerto Rico Maritime Shipping Auth.*, 475 F.Supp.

**2.** The United States did not dispute Smithfield's contention in its motion to dismiss that the court lacks jurisdiction under the District of Columbia's general jurisdiction provision, D.C.Code § 13–334, or its long-arm statute, D.C.Code. § 13–423(a)(1). As a result, the court deems the United States to have conceded that the court lacks jurisdiction under those provisions and need not analyze personal jurisdiction under District of Columbia law. *Stephenson v. Cox*, 223 F.Supp.2d 119, 121 (D.D.C.2002) ("[W]hen a plaintiff files a response to a motion to dismiss but fails to address certain arguments made by the defendant, the court may treat those arguments as conceded ....").

711, 716 (D.D.C.1979), *aff'd,* 1980 WL 130478 (D.C.Cir.1980); *see B.J. Semel Assocs., Inc. v. United Fireworks Mfg. Co.,* 355 F.2d 827, 832 (D.C.Cir.1965). This test looks to "the practical, everyday business or commercial concept of doing or carrying on business." *Chrysler Corp.,* 589 F.Supp. at 1195. The determination of whether a defendant has transacted business is largely a factual question, based on "tangible manifestations of doing business." *Caribe Trailer,* 475 F.Supp. at 716. The court determines whether a defendant transacted business in the forum at the time the cause of action arose. *Lee v. Ply\*Gem Indus., Inc.,* 593 F.2d 1266, 1273 (D.C.Cir.1979); *Eastland Constr. Co. v. Keasbey & Mattison Co.,* 358 F.2d 777, 780 (9th Cir.1966).

■ Although Smithfield itself does not transact business in the District of Columbia,[3] a corporation can transact business directly or indirectly through its agents or subsidiaries. *See, e.g., Eastman Kodak Co. v. S. Photo Materials Co.,* 273 U.S. 359, 373, 47 S.Ct. 400, 71 L.Ed. 684 (1927); *United States v. Scophony Corp. of Am.,* 333 U.S. 795, 810, 68 S.Ct. 855, 92 L.Ed. 1091 (1948); *In re Vitamins Antitrust Litig.,* 2001 U.S. Dist. LEXIS 25073, at \*24 (D.D.C. Oct. 30, 2001); *MCI Communications Corp. v. AT & T,* 1983 WL 1881, at \*7–8, 1983 U.S. Dist. LEXIS 13066, at \*22–23, 1983–2 Trade Cas. (CCH) ¶ 65,652 (D.D.C. Oct. 4, 1983); *Caribe Trailer,* 475 F.Supp. at 717. When a parent and its subsidiary are joined as defendants in an antitrust action, the court may exercise jurisdiction over the parent based on the activities of the subsidiary within the district " 'if the relationship between the parent and the subsidiary is such that the subsidiary may be considered the agent or the alter ego of the parent.' " *Caribe Trailer,* 475 F.Supp. at 717 (quoting *Audio Warehouse Sales, Inc. v. U.S. Pioneer Elecs. Corp.,* 1975 WL 866, 1975–1 Trade Cas. ¶ 60,213 (D.D.C.1975)). In order for the parent to be amenable to suit, the parent must exercise "continuing supervision and intervention in the subsidiaries' affairs." *Chrysler Corp.,* 589 F.Supp. at 1200 (citing *Scophony,* 333 U.S. at 814, 68 S.Ct. 855); *see Diamond Chem. Co. v. Atofina Chemicals, Inc.,* 268 F.Supp.2d 1, 10 (D.D.C.2003); *Vitamins,* 2001 U.S. Dist. LEXIS 25073, at \*24; *Caribe Trailer,* 475 F.Supp. at 717.

■ To determine whether a parent corporation controls its subsidiaries, the court looks to the totality of the relationship between the parent and its subsidiaries. *MCI Communications Corp.,* 1983 WL 1881, \*7, 1983 U.S. Dist. LEXIS, at \*21. Factors courts have considered include whether the parent has the capacity

---

**3.** The court notes that at the time of the alleged violations, Smithfield itself did not have officers or any persons employed in the District of Columbia, was not registered to do business in the District of Columbia, did not own, lease, or maintain any facilities or other property in the District of Columbia, did not have a District of Columbia post office box, telephone, or facsimile number, and did not have a bank or other financial account in the District of Columbia. Att. 3 to Def.'s Mot. to Dismiss (Cole Aff. ¶ 5). Smithfield has not maintained offices in the District of Columbia since 1993. Although it filed required tax returns and a corporate report in 1998 as a result of revenue from its sublease in 1997, the court does not find that the filing of these tax returns and corporate reports constitute transacting business of a continuous and systematic nature. *Cf. Access Telecom, Inc. v. MCI Telecommunications Corp.,* 197 F.3d 694, 717 (5th Cir.1999) (stating that renting or owning property in a forum does not confer general jurisdiction when the property is not used to conduct business in the forum). Thus, based on Smithfield's own contacts with the District of Columbia, Smithfield cannot be found and does not transact business in this district for purposes of the Clayton Act.

to influence the subsidiary's major business decisions, whether the parent and subsidiary have the same officers and directors, whether the parent and subsidiary maintain separate books and accounts, whether an integrated sales system exists between the parent and subsidiary, and whether the parent and subsidiary present a common marketing image. *See Diamond Chem.*, 268 F.Supp.2d at 10–11; *Vitamins*, 2001 U.S. Dist. LEXIS 25073, at *25; *Chrysler Corp.*, 589 F.Supp. at 1200; *MCI Communications Corp.*, 1983 WL 1881, at *8, 1983 U.S. Dist. LEXIS, at *22. Mere ownership of stock in a subsidiary is insufficient to establish that the parent corporation exercises control. *United States v. Bestfoods*, 524 U.S. 51, 61–62, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998); *Reynolds Metals Co. v. Columbia Gas Sys., Inc.*, 669 F.Supp. 744, 749 (E.D.Va.1987); *Caribe Trailer*, 475 F.Supp. at 717.

■ This court has stated generally that Section 12 does not require that the transactions on which jurisdiction is based be related to the underlying cause of action. *See Atlantigas Corp. v. Nisource, Inc.*, 290 F.Supp.2d 34, 49 (D.D.C.2003); *Diamond Chem.*, 268 F.Supp.2d at 10 (quoting *Chrysler Corp.*, 589 F.Supp. at 1204). However, in conducting an alter ego analysis, this court has stated that "[t]he essential element required before a court can find that one corporate entity was transacting business through an alter ego is control over the conduct that allegedly violated the antitrust laws." *Caribe Trailer*, 475 F.Supp. at 718. This court recently held that "looking to the contacts of subsidiaries not involved in the conspiracy would not serve the purpose of Section 12 of the Clayton Act." *Diamond Chem.*, 268 F.Supp.2d at 11–12. "The purpose behind the Clayton Act's venue provision is to hold offending corporations accountable in the areas where their offensive conduct

took place; to use the contacts of uninvolved subsidiaries would not serve the purposes of the provision." *Id.* at 12. The court in *Diamond Chemical* found that Clayton Act cases in which courts had attributed the jurisdictional contacts of a subsidiary to the parent examined the activities of only the subsidiaries involved in the anti-competitive conduct in the district, not uninvolved affiliates. *Id.* (citing *Scophony*, 333 U.S. at 814, 68 S.Ct. 855; *Chrysler Corp.*, 589 F.Supp. at 1201–02; *Cascade Steel Rolling Mills, Inc. v. C. Itoh & Co.*, 499 F.Supp. 829, 838–40 (D.Or. 1980)). Thus, this court will consider only the jurisdictional contacts of any subsidiaries that were involved in the alleged violations of the Act.

■ The United States argues that the products of at least two of Smithfield's wholly-owned subsidiaries, Smithfield Packing Co., Inc. and Gwaltney of Smithfield, Ltd., are sold in most grocery stores in the District of Columbia, and Smithfield therefore transacts business in the district. *See* Ex. J to Pl.'s Opp'n. The United States' position is without merit. Even if the court were to assume that the amount of sales was substantial and that Smithfield controlled these subsidiaries, the United States has not alleged that these subsidiaries were connected with any violation of the Act. These subsidiaries are merely uninvolved affiliates for purposes of determining jurisdiction under the Clayton Act, and their activities are therefore not relevant in determining whether this court has personal jurisdiction over Smithfield. The United States has not alleged that Smithfield's investment subsidiary, SF Investments, Inc., through which Smithfield acquired the voting securities of IBP, transacted business in the District of Columbia. As a result, the United States' attempt to argue that Smithfield's subsidiaries are alter egos of Smithfield fails.

Because the conduct that allegedly violated the Clayton Act did not occur in the District of Columbia, it would be contrary to the purpose of the Clayton Act's venue provision to hold Smithfield accountable in this forum. Accordingly, the court concludes that this court lacks personal jurisdiction over Smithfield under Section 12 of the Clayton Act because neither Smithfield's own acts nor the acts of any relevant subsidiaries constitute transacting business in the district.

### III. CONCLUSION

For the foregoing reasons, the court concludes that it is unable to exercise personal jurisdiction over Smithfield. However, rather than dismiss this case, the court concludes that the better course is to "transfer [this] case ... to a district court for another district, in the interest of justice or for the convenience of the parties." 28 U.S.C. § 1412. Accordingly, this case shall be transferred to the Eastern District of Virginia. An appropriate order accompanies this memorandum opinion.