CHRYSLER CORPORATION, Plaintiff,

v.

GENERAL MOTORS CORPORATION
and Toyota Motor Corporation,
Defendants.

Civ. A. No. 84–115.

United States District Court,
District of Columbia.

May 29, 1984.

As Modified Aug. 29, 1984.

Joseph A. Califano, Gerald M. Rosberg, Hamilton Fox, Dewey, Ballantine, Bushby, Palmer & Wood, Washington, D.C., Leonard Joseph, Joseph Angland, Dewey, Ballantine, Bushby, ·Palmer & Wood, New York Office, New York City, for plaintiff.

Patrick F. McCartan, Richard Pogue, John Newman, Jones, Day, Reavis & Pogue, Washington, D.C., for General Motors.

Earl W. Kintner, Michael E. Jaffee, Robert J. Hirsch, Arent, Fox, Kintner, Plotkin & Kahn, Washington, D.C., for Toyota Motor Corp.

Edward T. Hand, Dept. of Justice, Washington, D.C., for amicus.

## MEMORANDUM OPINION AND ORDER

THOMAS F. HOGAN, District Judge.

In this antitrust suit, Chrysler Corporation ("Chrysler") seeks to enjoin the joint venture of General Motors Corporation ("General Motors" or "GM"), the world's largest automobile company and Toyota Motor Corporation ("Toyota" or "TMC"), the world's third largest automobile company, to manufacture and market later this year a compact automobile which will be derived from Toyota's new front-wheel drive "Sprinter." That car is currently only manufactured and marketed in Japan.

The Federal Trade Commission ("FTC") has carefully scrutinized the joint venture to ensure that the combination does not violate the antitrust laws and has authorized, over the dissent of two of the five reviewing commissioners, a final plan which contains several modifications to the parties' submitted plan.[1] At this early stage of the case the defendants have raised two crucial questions. The first is whether Chrysler has standing to complain about an injury which may result from future manufacturing and marketing of a product. To answer that question, defendants stress that the Court must decide whether Chrysler is complaining about an antitrust injury or merely an increase in competition, for the antitrust laws only protect against the former. The Court also must consider what standard of pleading and proof it should require Chrysler to meet at this early stage. The second issue, broadly stated, is whether Toyota, a Japanese corporation, is properly before the Court. This issue addresses whether venue is appropriate here, whether the Court has personal jurisdiction under the antitrust laws and local law over Toyota and whether Toyota has been properly served. After careful consideration of the memoranda submitted by the parties, the applicable legal precedents and the arguments of counsel and for the following reasons, the Court finds that Chrysler has standing to maintain this action and has alleged, at this time, sufficient facts to state a claim upon which relief could be granted. The Court further finds that it has personal jurisdiction over Toyota.

---

1. On February 17, 1983, GM and TMC executed a Memorandum of Understanding confirming their intentions to establish the joint venture. That Memorandum of Understanding was executed in California. (Affidavit of Takeo Tsukada, "Tsukada Aff.," ¶ 6.) The Memorandum of Understanding is discussed at Section I, *infra*. On April 11, 1984, the FTC made final its provisional approval of the manufacturing joint venture between GM and Toyota.

## I.

### TERMS OF THE JOINT VENTURE [2]

The Memorandum of Understanding states that the Joint Venture ("JV") will be limited in scope to the vehicle to be produced and the agreement is not intended to establish a cooperative relationship between the parties in any other business. MOU at 1. Nevertheless, it is the intent of the parties to provide such assistance to the JV as is considered appropriate to the enhancement of the JV's success. *Id.* at 1. Toyota will retain design authority over the vehicle, in consultation as to vehicle appearance with GM, the purchaser. *Id.* The JV will begin production of the GM-specific vehicle as early as possible in the 1985 Model Year with nominal capacity of approximately 200,000 units per annum at GM's former assembly facility in Fremont, California (*Id.* at 2).

As part of its technical assistance, Toyota will take the initiative, in consultation with GM, in designing the Fremont manufacturing layout and coordinating the related acquisition and installation of its machinery, equipment and tooling. In this regard, if GM deems it necessary for orders to be placed for construction of buildings, JV machinery, equipment and tooling prior to the establishment of the JV to facilitate a timely introduction of the initial JV vehicle in the 1985 Model Year, GM may do so in its own name directly or through Toyota, and the parties agree to share equally any capital expenditures or cancellation charges arising from such orders. The only exceptions to the above are as follows: In the event the JV is not established as a result of unfavorable U.S. governmental review of the matters set forth in the Memorandum or, following consultations between the senior management of Toyota and GM, as a result of either party

notifying the other on or prior to one hundred twenty (120) days following the signing of the Memorandum of Understanding by the parties that such party is not satisfied with the prospects for developing an acceptable employee relations structure, GM shall bear 100% of the cost of such expenditures and charges.

GM's annual requirments are presently expected to exceed 200,000 units per annum. *Id.* at 3. Both parties will therefore assist the JV in increasing its production to the maximum extent possible within the available capacity. Requirements for capacity beyond the first module will be the subject of a separate study. *Id.* The JV may later produce a variation of the JV vehicle for Toyota. Toyota and GM may also agree for GM to source the GM-specific vehicle from Toyota assembly plants in Japan, freeing JV capacity for Toyota's full or partial production of Toyota-specific vehicles. *Id.* All GM-specific vehicles produced by the JV will be sold directly to GM or its designated marketing units for resale through GM's dealer network. *Id.* at 4. If any variation of the JV vehicles should be produced by the JV for Toyota, such vehicles would be sold directly to Toyota or its designated marketing unit for resale through Toyota's dealer network. *Id.* Neither Toyota nor GM will consult the other with respect to the marketing of JV products, or any other products, through their respective marketing organizations. *Id.*

Vehicles sold by the JV should be priced by the JV to provide a reasonable profit for the JV, Toyota, and GM. *Id.* To accomplish this, production costs must be kept as low as possible through the combined best efforts of the JV, Toyota, GM and other major suppliers. *Id.* In this regard, the parties have been conducting extensive

---

**2.** The terms of the joint venture are taken from the Memorandum of Understanding (MOU). Those that are critical to comprehend the nature of the joint venture are included here as well as those that are of express concern to Chrysler. To the extent that any of the information revealed in this section, or in the later discussion of Toyota's amenability to suit, was sealed by

the parties, the Court has found it necessary to unseal this information. The parties freely discussed this data at the argument on the motion and there should be no prejudice by this Court's setting forth the relevant terms of the agreement between the parties or of those facts which the Court has found support personal jurisdiction.

studies detailing how each can work to minimize JV expenses. *Id.*

The initial JV selling price of the JV vehicle to be sold to GM during the 1985 Model Year will be determined at least 60 days prior to the start of production by negotiation between the JV and GM. *Id.* at 5. This negotiation will be based on the production cost estimated 90 days prior to the expected start of production by the JV, with estimates of said cost to be guided by the feasibility study. *Id.* In no event, however, will the said initial JV selling price be higher than the upper limit nor lower than the lower limit, each as defined below. *Id.* The upper limit shall be determined by adjusting for feature differences the Dealer Net Price less 8% of Toyota's then current U.S. model front-wheel drive Corolla equipped comparably with the JV vehicle concerned, and the lower limit shall be determined by adjusting for feature differences the Dealer Net Price less 11% of said Corolla. *Id.* The adjustment for feature differences will be made by agreement between the JV and GM. *Id.*

Thereafter, although there may be exceptions, the JV vehicle selling price will be revised and determined for each model year. *Id.* The new selling price for the new model year will be determined by applying to the selling price for the previous model year the Index as defined in Exhibit A. *Id.* Since the calculations embodied in the Index may occasionally yield a selling price which is at significant variance with then current market conditions, the JV and GM will in such cases negotiate a more appropriate selling price. *Id.* at 6.

If model changes or specification changes of the vehicle manufactured by the JV are necessary, Toyota, GM and the JV will agree upon these model changes or specification changes. *Id.* Toyota will present to the JV the plan for the model changes or specification changes concerned. *Id.* Then, the JV will submit to and negotiate with GM the planned model changes and specification changes together with the planned price changes. These model changes and specification changes will be made as agreed upon by the JV and GM. *Id.*

The methodology to be employed in pricing optional equipment available on the JV vehicle (both initial and subsequent) will be comparable to that described in the three preceding paragraphs. *Id.*

The initial prices of Toyota and GM components purchased by the JV will be determined 90 days or more prior to the start of production by negotiation between the JV and component suppliers after the determination of the specifications of the JV vehicle. *Id.* Identification of the respective sources of supply and determination of the initial component prices will be guided by the feasibility study, with adjustments made for changes in specifications and appropriate economics. *Id.*

Thereafter, the prices of components will be reviewed semi-annually. *Id.* at 7. The new prices will be determined by negotiation between the JV and component suppliers. *Id.*

If it is anticipated that continuation of the above-mentioned methods for determination of the prices of the JV vehicles to be sold by the JV and of components to be purchased by the JV would cause those prices to be at such levels as the JV would incur the losses which could endanger the normal operation of the JV, Toyota, GM and the JV shall negotiate and take necessary measures. *Id.*

As a fundamental principle, Toyota and GM shall each be free to price and free to market the respective vehicles purchased from the JV without restrictions or influence from the other. *Id.*

*Operating Responsibility*

The JV will be jointly controlled by an equal number of Toyota and GM directors, in line with Toyota and GM ownership. *Id.* Toyota will designate the JV president as the chief executive officer and chief operating officer. *Id.* Toyota and GM will assign to the JV other operating officers as the JV president and JV directors may request, but the parties recognize that the question of which party shall designate the

JV officers in charge of financial affairs, labor relations and certain other operations has not yet been agreed upon. *Id.*

*Technical Assistance*

Toyota will grant to the JV the license to manufacture the vehicle developed by Toyota, and in exchange for this license, the JV will pay a reasonable royalty to Toyota as may be agreed upon by the parties. *Id.* at 9. Toyota and GM will license the ·necessary industrial property rights to the JV, and in exchange for these rights, the JV will pay reasonable license fees to Toyota and/or GM as may be agreed upon by the parties. Toyota and GM will also provide technical assistance to the JV on a cost basis plus reasonable markup. *Id.*

As part of the technical assistance, GM agrees to assist Toyota and the JV in completing compliance tests for safety, emissions and other areas, as agreed upon by the parties. *Id.*

*Purchase/Sale of Equity Interest*

Toyota and GM (including, subject to the approval of the other party, their wholly or majority-owned subsidiaries) will each hold a 50% equity interest in the JV. *Id.* Neither party may transfer its equity interest in the JV to a third party without the written consent of the other. *Id.* The above notwithstanding, the JV will terminate not later than 12 years after start of production. *Id.* The methodology for disposition of Toyota and GM equity interests prior to or upon JV termination will be incorporated in the JV documentation. Any surplus or deficit of the JV as at termination of the JV will be shared equally by Toyota and GM, in line with Toyota and GM ownership. *Id.* at 10. Other issues relating to JV termination will be separately discussed. *Id.*

*Financing*

Both Toyota and GM will contribute cash and/or fixed assets to the JV in exchange for equity interests. *Id.* The amount to be contributed as equity will depend upon the JV's total projected capital requirements. *Id.* In the event that either lenders or lessors insist that payments made by the JV be subject to appropriate guarantees, Toyota and GM agree either to provide such guarantees based on their pro rata share of the JV or to temporarily advance funds to the JV on their own account (also on a pro rata basis). *Id.* To the extent permitted by creditors, Toyota and GM further agree that any security interests held by the parties in the JV assets will be shared equally. *Id.*

*Future Difficulties*

If it is anticipated that the establishment or continuation of the JV would become difficult or infeasible due to any legal, political or labor-related reason which may arise in the United States, the parties will in good faith discuss the measures to be taken concerning the JV and endeavor to find appropriate solutions.

## II.

### STANDING AND RULE 12(b)(6) ANALYSIS

▇ Chrysler brings this suit under Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2,[3] respectively, and Section 7 of the Clayton Act, 15 U.S.C. § 18 (1982). This Court has subject matter jurisdiction over this suit pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 16 of the Clayton Act, 15 U.S.C. § 26.

> Section 7 provides, in pertinent part, No person engaged in commerce or in any activity affecting commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no person subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the

---

**3.** The pertinent part of Section 1 provides,
   Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is declared to be illegal ...

15 U.S.C. § 1 (1982).

   Section 2 sets forth the penalty for those monopolizing, attempting to monopolize, combine or conspire to monopolize any part of the trade or commerce ‚among the several states or with foreign nations.

assets of another person engaged also in commerce or in any activity affecting commerce where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly ...

15 U.S.C. § 18 (1982).

Section 16 provides, in pertinent part,

Any person, firm, corporation or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, ..., when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings, and upon the execution of proper bond against damages for an injunction improvidently granted and a showing that the danger of irreparable loss or damage is immediate, a preliminary injunction may issue ....

15 U.S.C. § 26 (1982). Section 16 of the Clayton Act, which authorizes injunctive relief for injuries threatened by a violation of the antitrust laws, is to be distinguished from Section 4, which authorizes recovery of treble damages where there is injury to a person in "his business or property by reason of anything forbidden in the antitrust laws...," 15 U.S.C. § 15 (1982).

In *Merit Motors, Inc. v. Chrysler Corp.*, 569 F.2d 666 (D.C.Cir.1977), this Circuit recognized that while Section 4 authorizes recovery of treble damages by one who has been injured, Section 16 allows a suit for an injunction where there has been a *threatened* injury. The Court explained,

The showing of injury required for a suit seeking an injunction is less than that required to sue for treble damages since only *threatened* rather than actual damages must be proved.

*Id.* at 670 n. 14. In that case, where the programs which plaintiff challenged had been in existence long enough so that their potential effects on dealers could manifest themselves, the Court recognized that the difference in the two standards was not so consequential. *Id.*

Section 16 is further distinguished from Section 4 because the right to sue under Section 16 extends to "threatened as well as actual injuries and is not limited to injuries to a party's business or property." *Optivision, Inc. v. Syracuse Shopping Center Assoc.*, 472 F.Supp. 665 (N.D.N.Y. 1978). The Supreme Court has recognized that a plaintiff seeking relief under Section 16 need not show actual injury caused by defendant's anticompetitive conduct; he need only demonstrate significant threat of injury from impending violation of the antitrust laws or from a contemporary violation that is likely to continue or recur. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 129–31, 89 S.Ct. 1562, 1579–80, 23 L.Ed.2d 129 (1969), *rev'd on other grounds*, 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77, *reh'g denied*, 401 U.S. 1015, 91 S.Ct. 1247, 28 L.Ed.2d 552 (1971). In summary, to achieve standing under Section 16, the petitioner must demonstrate that he is threatened with loss or injury proximately resulting from the antitrust violation, *Mid-West Paper Products Co. v. Continental Group*, 596 F.2d 573, 591–92 n. 74, *citing*, *Jeffrey v. Southwestern Bell*, 518 F.2d 1129 (5th Cir.1975).

With this distinction in mind but before it reviews the parties' arguments, the Court will set forth Chrysler's allegations. Chrysler alleges that GM has captured about 70% of the market for large automobiles, 27% of the market for small automobiles and 15% of the market for subcompact automobiles. (Complaint, ¶ 30.) It further alleges that GM and Toyota are the price leaders in the relevant markets for domestic and foreign automobile manufacturers, respectively. (*Id.* at ¶ 32.) Chrysler defines the market affected as the manufacture, assembly, and sale of automobiles, including subcompacts and small and large automobiles and the geographic market as the United States. (Complaint, ¶ 24.) Chrysler alleges that subcompact automo-

biles play a major role in the marketing of all automobiles sold by major manufacturers because they serve as the starting point for the industry's price structure, as manufacturers establish prices for automobiles largely by maintaining certain differentials between the successive sizes of automobiles. (*Id.* at ¶ 28(a)) Furthermore, Chrysler alleges that subcompacts are crucial in determining the manufacturer's ability to attract customers to its dealer showrooms (*id.* at ¶ 28(b)), are important in shaping long-term consumer attitudes toward a manufacturer and developing basic consumer loyalties (*id.* at ¶ 28(c)) and their manufacture is essential to meeting the federal government's corporate average fuel economy standards. (¶ 28(d).)

Chrysler asserts that the joint venture will lessen actual and potential competition and tend to create a monopoly in violation of Section 7 of the Clayton Act. In particular, it alleges in paragraph 35[4] that:

(a) **The proposed joint venture between GM and Toyota will destroy existing competition in the design and manufacture of subcompact automobiles.** Chrysler maintains that were it not for the joint venture, GM would have to market its own existing subcompact or independently design and manufacture a subcompact model to replace it; furthermore the product to be marketed is based on one of Toyota's existing models;

(b) **The joint venture will adversely affect price competition between GM and Toyota.** Since the price of the new car in part will be determined by the price of other GM and Toyota subcompacts, GM and Toyota will have a strong incentive to adjust pricing of all of their products to maximize their combined profit not only on the joint venture car but on other cars as well. As this will decrease the extent to which they are pitted against one another in the market place, it affronts the "robust competition that the antitrust laws are designed to foster."

(c) **The joint venture will reduce price competition between GM and Toyota on one hand and other automobile manufacturers on the other.** Since the price of the joint venture vehicle will be formulated in part from the price of subcompact automobiles of other manufacturers, GM and Toyota will have an incentive to use their combined resources to discipline any competitor who elects to compete vigorously on price and "thereby, through the workings of the formula, reduce the price of the Sprinter."

(d) **The proposed joint venture between GM and Toyota will provide a substantial disincentive for Toyota to begin independent manufacturing operations in the United States.** Due to the voluntary import limitations, Toyota would, in the absence of the joint venture, be required to begin American manufacture of its products. Since the joint venture accomplishes this for it, Toyota has no incentive to do this on its own.

(e) **Until now, each of the American based automobile manufacturers has manufactured its own line of subcompact cars in the United States, with only limited reliance on imports.** The joint venture will be repeated by other U.S. manufacturers, "resulting in a surrender of the market to a handful of Japanese manufacturers."

(f) **Permitting GM to acquire the Sprinter without making the capital investment that other American-based manufacturers are required to make to develop a subcompact automobile will not only strengthen its position in the subcompact and small automobile markets, but will also entrench its dominant position**

---

**4.** For the purpose of brevity, the Court has repeated here the first sentence of each subparagraph of Chrysler's allegations. It has then paraphrased Chrysler's support for those allegations except where specifically quoted from the Complaint.

in the market for large automobiles by reinforcing the substantial market position and marketing power of the GM distribution system. GM can then concentrate on developing larger models, in which it already has almost impregnable status. Toyota will likewise not compete vigorously in the large car market since this would disrupt the scheme described in paragraph 28(a).

(g) **The combination of GM and Toyota, the largest domestic and import automobile manufacturers, is likely to foster mergers, acquisitions, or joint venture relationships involving other major automobile companies, the cumulative effect of which will be a further lessening of competition.**

(h) **In the course of planning and carrying out the joint venture, GM and Toyota have shared and will continue to share information about their pricing, marketing and product development.** GM is to receive advance notice of design changes in the Toyota Corolla, has already received such information about improvements in it other 1983 and 1984 models, and will exchange information about other manufacturers' products. "By sharing such information, GM and Toyota will be able jointly to plan and time their product development, marketing pricing and advertising programs so as to minimize the extent to which they compete head-to-head with each other, thereby redirecting their efforts at other manufacturers such as Chrysler.

In support of its claim, based on Section 1 of the Sherman Act, Chrysler incorporates its allegations and further alleges that GM and Toyota have, since December, 1981, exchanged product development, engineering, manufacturing, assembly, pricing, and cost information, conducted engineering feasibility cost and investment studies and that they have agreed on an approach to pricing the joint venture vehi-

cle, which results in an agreement to fix the prices of their separate production. (*Id.* at ¶¶ 37–39.) In support of its claim based on Section 2 of the Sherman Act, Chrysler alleges that through the joint venture provision permitting supply arrangements with and equity interests in Isuzu and Suzuki, GM has attempted to monopolize the market for all automobiles. (*Id.* at ¶ 41.) This will happen because, by avoiding the expense of developing a new subcompact automobile, "GM enables itself to devote disproportionate resources to other segments of the automobile market." (*Id.* at ¶ 42.) As a further result, the dealers of GM's competitors will either "go out of business or switch allegiance to GM, ... GM will gain sales, in all segments of the automobile market." *Id.* at 43. Finally, Chrysler alleges that

GM's participation in the joint venture, viewed either in isolation or in conjunction with the remainder of its Japanese strategy, wilfully perpetrates and enhances its monopoly position and thus constitutes monopolization of the large automobile market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

*Id.* at ¶ 47.

Chrysler asks this Court to declare that the joint venture violates Section 7 of the Clayton Act and Sections 1 and 2 of the Sherman Act, enjoin them from carrying out the joint venture and take such steps as this Court deems necessary to remedy its injuries which allegedly result from defendants' sharing of information.

GM first argues that Chrysler has not alleged a personal injury as it is required to do under *U.S. v. Borden Co.*, 347 U.S. 514, 74 S.Ct. 703, 98 L.Ed. 903 (1959). That case stands for the proposition that when a private plaintiff sues under the antitrust laws, it must allege an injury to itself. In contrast, when the United States is the plaintiff in an antitrust suit, it may allege an injury to the public interest. GM relies on *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977), to define the type of personal injury a private plaintiff must al-

lege. In that case, a bowling center sued one of the two largest bowling equipment manufacturers and largest bowling centers for damages and injunctive relief, claiming that petitioner's acquisitions of competing bowling centers that had defaulted in payments for bowling equipment they had bought from Brunswick might lessen competition or tend to create a monopoly in violation of Section 7. The Court framed the issue as whether antitrust damages are available when the sole injury alleged is that competitors were continued in business, thereby denying respondents an anticipated increase in market shares. Respondents urged that petitioners must show that there was a violation of Section 7 and that they were in a worse position than if there was no alleged antitrust violation. The Supreme Court agreed, stating,

> ... [F]or plaintiffs to recover treble damages on account of § 7 violations, they must prove more than injury causally linked to an illegal presence in the market. Plaintiffs must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be "the type of loss that the claimed violations ... would be likely to cause."

*Id.* at 489, 97 S.Ct. at 697 (emphasis in original) (citation omitted).

The Court explained that there is a violation of Section 7 where "acquisitions bring a 'deep pocket' parent into a market of pygmies." The Court found that the plaintiff's injury bore no relationship to the size of either the acquiring company or its competitors and second that there was no relationship demonstrated between the defendants' actions and plaintiff's injuries. The Court explained that they would have suffered the same loss, but no compensable

injury, had the acquired centers obtained refinancing or were purchased by shallow pocket parents. The Court concluded that if petitioners had been injured it was not by reason of anything forbidden in the antitrust laws.[5]

GM argues that the *Brunswick* standard applies to injunction actions as well, as was recognized by the Third Circuit in *Shoenkopf v. Brown and Williamson Tobacco Co.,* 637 F.2d 205 (3rd Cir.1980). There, plaintiff sought treble damages under the Sherman Act and injunctive relief under the Robinson-Patman Act against 3 of 6 major tobacco companies. The tobacco companies were engaged in promotional activities with vending machine operators who received certain sums for participating in these arrangements. Plaintiff was the reporting agent/liaison between the small operators with vending machines and the tobacco companies. Tobacco companies then reneged on these arrangements. Plaintiff claimed they refused to deal and failed to offer merchandising promotional allowances to small cigarette vending machine operators in further violation of Section 16. The Court concluded that plaintiff lacked standing and that defendants' failure to deal with the small companies directly was what had been the genesis of his business success. Plaintiff's injury resulted from the tobacco companies' decision to deal directly with the vending machine operators, rather than through a middle man. In *Shoenkopf,* the Third Circuit recognized that while there was a lower standard of proof required of plaintiffs who were seeking injunctive relief, plaintiffs still had to allege that they suffered an antitrust injury that flowed from a defendant's violation of the laws. This Court does not disagree with *Shoenkopf;* it is just not sure that it adds much to the questions the Court must already ask under *Brunswick. Shoenkopf* reiterates a rule but stops short of defining that quantum of facts a plaintiff need al-

---

5. The Court did note generally that Section 4 plaintiffs need not prove an actual lessening of competition to recover. The Court reasoned that that effect may only be felt after price competition is initially stimulated but before a competitor is driven from the market. *Id.,* 429 U.S. at 489 n. 14, 97 S.Ct. at 698 n. 14.

lege to demonstrate that it is *threatened* with an antitrust injury. The Court finds it much more direct to consider those cases that have specifically discussed recovery of injunctive relief. The Supreme Court addressed that issue in *Brown Shoe Co. v. United States*, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). In that case, the United States sought to enjoin the merger of Kinney Shoes and the Brown Shoe Company. The Court was required to consider the effect of the merger between Brown (the third largest seller of shoes by dollar volume, with over 1230 owned and operated retail outlets) and Kinney (the 8th largest company with 350 retail outlets). The district court found that the shoe industry was characterized by a small number of large companies who occupied a commanding position. The Court explained that the legislative history of Section 7 "illuminates Congressional concern with the protection of competition, not competitors and its desires to restrain mergers are only to the extent that such combinations may tend to lessen competition." *Id.* at 320, 82 S.Ct. at 1521. *See United States v. Penn-Olin Chemical Co.*, 378 U.S. 158, 84 S.Ct. 1710, 12 L.Ed.2d 775 (1964) (holding that Section 7 applies to joint ventures and plaintiff need prove only reasonable likelihood of a substantial lessening of competition). The Court further explained that a district court should inquire as to

> [w]hether the consolidation was to take place in an industry that was fragmented rather than concentrated, that had seen a recent trend toward domination by a few leaders or had remained fairly consistent in its distribution of market shares among the participating companies, that had experienced easy access to markets by suppliers and easy access to suppliers by buyers or had witnessed foreclosure of business, that had witnessed the ready entry of new competition or the erection of barriers to prospective entrants, all were aspects, varying in importance with the merger under consideration, which would properly be taken into account.

*Id.*, 370 U.S. at 322, 82 S.Ct. at 1522.

Specifically the Court explained that the validity of an economic arrangement between companies performing similar functions in the production or sale of comparable goods or services, i.e., a horizontal merger, will depend on such factors as the

> relative size and number of the parties to the arrangement, whether it allocates shares of the market among the parties, whether it fixes prices at which the parties will sell their product or whether it absorbs or insulates competitors.

*Id.* at 334–35, 82 S.Ct. at 1529.

In two cases cited by the parties, district courts undertook this analysis. In *Monfort of Colorado, Inc. v. Cargill, Inc.*, 591 F.Supp. 683 (D.Col. Dec. 1, 1983), plaintiff sought to enjoin a merger between the second and third largest beef packers in the relevant market. There, the Court rejected the same argument defendants urge here, that plaintiffs were only complaining about increased competition. The Court held Monfort to a lesser burden of proof because it sought injunctive relief and found that plaintiff had standing since it had alleged threatened injury from a combination of the most dominant forces in the market. *Monfort*, at 694. In *Pennzoil Co. v. Texaco, Inc.*, No. 84–C–29–E (N.D.Okla. Feb. 4, 1984), 1984–1 Trade Cas. (CCH) ¶ 65,848, *affd*, No. 84–1169, (10th Cir. Feb. 9, 1984), 1984–1 Trade Cas. ¶ 65,896, the Tenth Circuit Court of Appeals affirmed the district court's denial of a preliminary injunction under Section 16. There Pennzoil had sought to enjoin the proposed acquisition of Getty by Texaco on the ground that a merger would violate Section 7. There are several important distinctions between *Pennzoil* and this case. First, *Pennzoil* was not presented to the District Court on a motion to dismiss; the Court allowed Pennzoil to adduce its proof at a six day evidentiary hearing. It was only after doing so and "assuming arguendo a violation of § 7 [that] this Court could find neither an anti-competitive injury to plaintiff flowing from such a violation," at 1186, nor an injury sufficient to establish the violation as a substantial factor in the occurrence of the damage. *Id.*

And while the Court expressed its doubts about the merits with respect to the preliminary injunction issue, this finding did not bar plaintiff from trial.

GM primarily relies on *Associated General Contractors of California v. California State Council,* 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983), to demonstrate that Chrysler cannot recover for speculative antitrust injuries. In that case, unions sued a multiemployer association alleging that defendants coerced third parties and some of plaintiff's members to enter business relationships with non-union contractors, thus adversely affecting the trade of certain unionized firms, with the consequence of restraining the union's business activities. The issue in that case was whether the complaint sufficiently alleged that the unions had been injured in their business or property by reason of anything forbidden in the antitrust laws, under Section 4 of the Clayton Act. The Supreme Court assumed that plaintiff could prove those facts alleged in its complaint as all courts are required to do on a motion to dismiss. *Id.* at 902. The Court questioned whether the union was a proper party to assert the injury since it was neither a consumer nor a competitor. *Id.* at 909. After examining the plaintiff's harm, the alleged wrongdoing of the defendant and the relationship between them, the Court concluded that plaintiff did not have standing since there existed independent factors that would require the Court to speculate whether defendant's violation of the antitrust laws caused plaintiff's injury. *Id.* at 911. *Associated General* is distinguishable from this case. The injury to Chrysler is clearly not as attenuated as that alleged to have been suffered by the union in *Associated General.*[6] Furthermore, assuming as it must that Chrysler can prove the allegations set forth in its complaint, the Court cannot state, on the record before it, that Chrysler would not be entitled to recover for the decreased competition between defendants which will it alleges result from the joint venture. In *United States v. Penn-Olin, supra,* the Supreme Court stated that

the requirements [of Section 1] are satisfied when the tendency toward monopoly or reasonable likelihood of substantial lessening of competition in the relevant market is shown.

*Id.,* 378 U.S. at 171, 84 S.Ct. at 1717.

Furthermore, Chrysler alleges, and for the purpose of this motion, the Court must accept that its injury derives not from the mere existence of a joint venture, but from the fact that the joint venture parents are GM and Toyota, the first and third largest automobile companies in the world. Such allegations satisfy the pleading requirements of Section 7. *See Ernest W. Hahn, Inc. v. Codding,* 615 F.2d 830, 845 (9th Cir.1980); *Monfort, supra.*

In addition to recognizing the potential for antitrust injury which flows from the tendency toward monopoly, the Supreme Court has also found that the exchange of price information among competitors carries with it the potential "for the development of concerted price-fixing arrangements which lie at the core of the Sherman Act's prohibitions." *United States v. United States Gypsum Co.,* 438 U.S. 422, 457, 98 S.Ct. 2864, 2883, 57 L.Ed.2d 854 (1978). The dissenting FTC Commissioners both cited this potential as one of the reasons they could not authorize the joint venture. *See* 48 Fed.Reg. 57252–57 (December 28, 1983). Parenthetically the Court notes that under traditional standing concepts, Chrysler is within the zone of interest of the antitrust provisions it asserts. *See Autolog Corp. v. Regan,* 731 F.2d 25 at 29–30 (D.C.Cir.1984).

Though this matter is before the Court at this time only on a motion to dismiss for failure to state a claim, the Court finds instructive the cases and authorities which have considered whether summary judgment involving a more developed record is

---

**6.** Nor is there a question of whether defendants intend to take the actions alleged, as there was in *General Fireproofing Co. v. Wyman,* 444 F.2d 391, 393 (2nd Cir.1971), another case relied on by the defendants.

appropriate. The general view has been that while summary judgment is proper where there is established a *per se* violation of the antitrust clause, "where the impact of the alleged violation is too little known, and the bare bones of the paper record are insufficient to pass judgment thereon, a trial should be had." J. Moore, Moore's Federal Practice § 56–741–42 (3rd ed. 1982). *See Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962) (noting that summary procedures should be used sparingly in complex antitrust litigation); *George C. Frey Ready-Mix Concrete, Inc. v. Pine Hill Concrete Mix Corp.*, 554 F.2d 551 (2nd Cir.1977) (discussing standards for both motions under Rules 12 and 56).

In support of granting a motion for summary judgment after a factual record had been developed, the Supreme Court in *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968) stated,

> while we recognize the importance of preserving litigants' rights to a trial on their claims, we are not prepared to extend those rights to the point of requiring that anyone who files an antitrust complaint setting forth a valid cause of action be entitled to a full-dress trial notwithstanding the absence of any significant probative evidence tending to support the complaint.

*Id.* at 289–90, 88 S.Ct. at 1592–93. Thus, while summary judgment is not unknown in antitrust cases, it has often been granted improvidently. In *Littlejohn v. Shell Oil Co.*, 483 F.2d 1140 (5th Cir.) (en banc), *cert. denied*, 414 U.S. 1116, 94 S.Ct. 849, 38 L.Ed.2d 743 (1973), the Fifth Circuit ex-

plained that the "fatality rate ... is largely the result of prematurity through inordinate attention to theories of law at a time when the facts have not been fully developed."

With the standards for evaluating a complaint sought to be dismissed under Rule 12 in mind and upon a review of the allegations set forth in Chrysler's complaint, this Court finds that neither *Cities Service, Poller* nor *Penn-Olin* dictates that Chrysler's complaint be dismissed at this time.

### III.

## TOYOTA'S AMENABILITY TO SUIT IN THIS JURISDICTION

■ Even if a Court is statutorily authorized to exercise personal jurisdiction over a defendant, it must nevertheless also ensure that the defendant has the requisite minimum contacts with the jurisdiction so that the exercise of personal jurisdiction will comport with due process. *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). In analyzing whether it has personal jurisdiction over a defendant the Court must thus engage in a two step inquiry; the parties in this case have focused the inquiry along these lines.

Chrysler asserts that the Court is statutorily authorized to assert personal jurisdiction over Toyota by virtue of Section 12 of the Clayton Act, 15 U.S.C. § 22 (1982) ("Section 12"), and two of the District's long arm provisions, 13 D.C.Code § 423(a)(1) and § 423(a)(4)[7] It also maintains that Toyota has the minimum contacts with this jurisdiction for this Court to

---

7. The applicable sections provide:
    (a) A District of Columbia court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person's—
    (1) transacting any business in the District of Columbia;
    . . . .
    (4) causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia if he regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial

revenue from goods used or consumed, or services rendered, in the District of Columbia;
    . . . .
    (b) When jurisdiction over a person is based solely upon this section, only a claim for relief arising from acts enumerated in this section may be asserted against him.
    The parties have thus bifurcated their arguments. The major distinction between the two statutes is that the contacts analyzed under the D.C.Code sections must have a nexus with the acts upon which suit is based.

exercise personal jurisdiction over Toyota. The Court first examines personal jurisdiction under the antitrust statute, and explains the government contacts exception. It then sets forth Toyota's commercial contacts with the District of Columbia and analyzes those contacts against the standards of the antitrust statute and the local long-arm provisions.

## A.

### Section 12

Section 12 provides,

Any suit, action or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district of which it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found.

15 U.S.C. § 22 (1982). Section 12 essentially is a long-arm statute which permits service of process in a non-forum district, so long as the venue provision is met. *Frederick Cinema Corp. v. Interstate Theatres Corp.*, 413 F.Supp. 840, 841–42 n. 1 (D.D.C. 1976). From a plain reading of the statute, venue is appropriate in any district where the defendant is an inhabitant, where it may be found or where it transacts business. A corporation is said to be an inhabitant of the state of its incorporation. *Aro Manufacturing Co. v. Automobile Body Research Corp.*, 352 F.2d 400 (1st Cir. 1965), *cert. denied*, 383 U.S. 947, 86 S.Ct. 1199, 16 L.Ed.2d 210 (1966). Toyota Motor Corporation is incorporated under the laws of Japan and has its headquarters and principal place of business there. (Affidavit of Takeo Tsukadak ¶ 2.) It is therefore not an inhabitant of the District of Columbia.

For venue to be proper in the District of Columbia, therefore, Toyota must either be "found" or transact business in this district. A corporation must engage in greater activities to be "found" within a district than it must to be "transacting business" there. *Grappone, Inc. v. Subaru of America, Inc.*, 403 F.Supp. 123,

128 (D.N.H.1975). A corporation is "found" where it has "presence and 'continuous local activities' within the district." *Fox-Keller, Inc. v. Toyota Motor Sales, Inc.*, 338 F.Supp. 812, 815 (E.D.Pa.1972) (citation omitted). On the other hand, "a corporation is engaged in transacting business in a district ... if in fact, in the ordinary and usual sense, it 'transacts business' therein of any *substantial* character." *Eastman Co. v. Southern Photo Materials Co.*, 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684 (1927) (emphasis added). The test of venue has been described as the practical, everyday business or commercial concept of doing or carrying on business "of any substantial character." *United States v. Scophony Corp.*, 333 U.S. 795, 807, 68 S.Ct. 855, 861, 92 L.Ed. 1091 (1948). This "practical, nontechnical, business standard" is not altered because the defendant is a company incorporated outside of the United States. *Id.* at 810, 68 S.Ct. at 863.

With the following standards in mind, the Court now will evaluate Toyota's contacts with this jurisdiction. Toyota has submitted the affidavit of Takeo Tsukada, the general counsel and a director of TMC who has, *inter alia*, stated that Toyota maintains one office in Washington, D.C., which has seven employees. (Tsukada Aff. ¶ 3.) The personnel in this office maintain a liaison relationship with the United States government and collect publicly available information on the motor vehicle industry in such areas as automobile safety, air and noise pollution, energy and research and development. (*Id.*) The Washington, D.C. office does not carry on commercial business activity for TMC. (Tsukada Aff. ¶ 4.) According to Toyota, the only meetings concerning the Memorandum of Understanding that took place in the District of Columbia were meetings with the FTC staff relating to the FTC's investigation of the proposed joint venture and meetings with lawyers concerning legal matters that related to issues involved in the FTC proceedings (Tsukada Aff. ¶ 7). Among other things, TMC's Washington, D.C. office does not buy or sell motor vehicles, materials or

technology; it does not solicit business for TMC in any manner, including the purchase of advertising; it does not maintain accounting or financial records. (*Id.*)

Toyota's position with respect to its amenability to suit is clearly sketched by these paragraphs of the Tsukada affidavit. Toyota maintains that the contacts it admittedly does have with this jurisdiction must be excluded from this Courts consideration because they are "government contacts." [8] On the other hand, Toyota stresses that it alone has none of the commercial contacts with this jurisdiction which the Court must evaluate under the "transacting business" test. Unfortunately, neither the parties' nor the Court's analysis ends with that simple double door-closing approach.[9]

### 1. THE GOVERNMENT CONTACTS EXCEPTION

■ Both federal and local trial and appellate courts in this district have recognized a "government contacts" exception to personal jurisdiction. Under that doctrine, a defendant's relationships with federal agencies do not enter the calculus of minimum contacts with the District of Columbia for jurisdictional purposes. *Mueller Brass Co. v. Alexander Milburn Co.*, 152 F.2d 142 (D.C.Cir.1945). In *Environmental Research International, Inc. v. Lockwood Greene Engineers, Inc.*, 355 A.2d 808 (D.C.1976), the District of Columbia Court of Appeals considered the "long standing and still vital doctrine that entry into the District of Columbia by non-residents for the purpose of contacting federal governmental agencies is not a basis for the assertion of in personam jurisdiction." *Id.* at 813 (citations omitted). The Court further explained that,

> [T]o permit our local courts to assert personal jurisdiction over non-residents whose sole contact with the District con-

sists of dealing with a federal instrumentality not only would pose a threat to free public participation in government, but also would threaten to convert the District of Columbia into a national judicial forum.

*Id.* (citations omitted).

■ In *Fandel v. Arabian American Oil Company*, 345 F.2d 87 (D.C.Cir.1965), a husband and wife who were residents of California sued a Delaware corporation which had its place of business in New York City for injuries sustained by the husband in Saudi Arabia. The United States Court of Appeals agreed that the District Court lacked personal jurisdiction over the defendant company. The defendant produced, refined and sold gas in Saudi Arabia and delivered the major portion of its product in Saudi Arabia; it did not solicit business, by advertising, or otherwise, in the District of Columbia and made no business contracts here. The Court recognized that while defendant maintained an office here for the purposes of receiving and transferring information, which was a significant element in its "diplomatic and intelligence apparatus," *id.* at 88, the presence of the office could not serve as a basis for exercising personal jurisdiction. The Court concluded that,

> ... Washington presents many business organizations with special needs for a continuous and ponderable presence here, which needs are not those customarily associated with strictly commercial operations ... [T]he purpose of Congress was not to make that presence in every case a base for the assertion of personal jurisdiction.

*Id.* at 89.

In *Traher v. DeHavilland Aircraft of Canada, Ltd.*, 294 F.2d 229, 230 (D.C.Cir. 1961), *cert. denied*, 368 U.S. 954, 82 S.Ct. 397, 7 L.Ed.2d 387 (1962), this Circuit found

---

**8.** Toyota argues that its government contacts are insufficient to subject it either to personal jurisdiction under Section 12 or under the D.C. long arm statute. For a discussion of Toyota's commercial contacts with the District and the D.C. long arm provisions, see Section III B, *infra.*

**9.** Chrysler has understandably expended many hours in discovery probing Toyota's specific Washington, D.C. contacts concerning the joint venture and Toyota's methods for carrying on business in this district.

that the District Court lacked personal jurisdiction because defendants sole agent in the District only solicited orders from the government in this district and was without authority to accept orders from any source or to execute contracts on defendant's behalf. The Court concluded that service of process on this employee must be quashed since plaintiff's personal injury suit, which it premised on defendant's negligence, had no connection with defendant's activities in the district. *Id.* at 230.

This District Court in *Siam Kraft Paper Co., Ltd. v. Parsons & Whittemore, Inc.,* 400 F.Supp. 810 (D.D.C.1975), held that it lacked personal jurisdiction over defendant whether it analyzed its government contacts or its private commercial contacts. There defendant, a New York based corporation involved in constructing and operating pulp and paper mills in foreign countries, secured a grant from the Agency for International Development and negotiated a loan from the Export-Import Bank to plaintiff. Plaintiff sought to premise this district's personal jurisdiction over defendant upon these two and similar contacts with the District of Columbia. The District Court held that the government contacts rule covered a defendant that took "advantage of the services, offered to prospective government investors, by various agencies of the government." *Id.* at 812. Furthermore, the court explained that it lacked personal jurisdiction "on an equivalent private commercial basis ... [because] the entry into any jurisdiction for the purpose of securing a loan or an insurance guaranty, with accompanying negotiations among the parties would [not] or should [not] confer jurisdiction on the local courts." *Id.* at 812.

The Court concludes that the exception does continue despite the parties' disagreement regarding its strength. In *Lockwood Greene,* an *en banc* panel of the D.C. Court of Appeals explicitly stated that the exception survived enactment of D.C.'s new long arm statute. *Lockwood Greene,* 355 A.2d at 813. In *Rose v. Silver,* 394 A.2d 1368 (D.C.1978), a *per curiam* panel of the District of Columbia Court of Appeals had an opportunity to examine that statement. In *Rose,* plaintiff sued defendants to recover attorney fees. Prior to that suit, defendants, a Connecticut corporation and its president, had hired plaintiff, an attorney, to go to Washington to negotiate with and if necessary to litigate against the Food and Drug Administration (FDA) to keep one of defendants' products on the market. A division panel held that the attorney was the agent of the corporation and that since defendants were transacting business in the District through an agent, they were amenable to long-arm service in the District, pursuant to 13 D.C.Code § 423(a)(1). The Court thereby distinguished its holding from *Lockwood Greene* since that case involved an independent contractor who was not controlled by or answerable to a principal. The Court further stated that while its decision did not conflict with *Lockwood Greene,* the government contacts exception did not dictate a different result. The Court of Appeals explained that the government contacts exception grew up as a limitation of the "doing business" requirement which appeared in D.C.'s predecessor long arm statute. Because 13 D.C. Code § 423(a)(1) extended in personam jurisdiction to all persons who could be reached consistent with due process, the Court in *Rose* questioned, first, whether the exception remained, and, second, if it did, whether its constitutional support was other than the due process clause. *Rose, supra,* at 1373. The Court determined that the First Amendment protection of an individual's right to petition the government for redress of grievances was also at the heart of the exception's rationale. It therefore concluded that "the First Amendment provides the only principled basis for exempting a foreign defendant from suit in the District of Columbia, when its contacts are covered by the long arm statute and are sufficient to withstand a traditional due process attack." *Id.* at 1374. A majority of the appeals court judges voted to deny the petition for rehearing *en banc, Rose v. Silver,* 398 A.2d 787 (D.C.1979). Two judges dissented, stating that an *en banc*

rehearing was necessary since *Rose* was directly in conflict with *Lockwood Greene* and only an *en banc* panel could reverse a prior *en banc* opinion. *Id.* at 787. The dissenting judges found error in the appellate court's independent contractor analysis since that issue had not been considered by the trial court. They further opined that the Court's reliance on plaintiff's forum contacts as a basis for exercising jurisdiction over the defendants had been expressly rejected by the Supreme Court in *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283 (1958). *Rose,* 398 A.2d at 788.

Since *Rose* there has been no consistent approach in applying the government contacts exception. For example, in *Naartex Consulting Corp. v. Watt,* 722 F.2d 779 (D.C.Cir.1983), the Court explained that the procedural history of *Rose* would make it hesitant to find that the government contacts exception has been abolished. *Naartex Consulting Corp.,* 722 F.2d at 786. The Court found that defendants' office in D.C., which monitored legislative and regulatory matters and maintained official contacts with the Congress and executive branch, was engaged in the type of first amendment petitioning of government that *Rose* found to be within the government contacts exception. *Id.* at 786–87. In *Steinberg v. International Criminal Police Organization,* 672 F.2d 927, 932 n. 10 (D.C.Cir.1981), this Circuit recognized that a "blanket exemption for governmental contacts no longer exists in the District of Columbia." The Court then found that 13 D.C.Code § 423(a)(4) supported a finding of personal jurisdiction over Interpol because of its mutually beneficial relationship with the United States and its regular contacts with the United States and the District of Columbia. *Id.* at 932. In *Investment Co. Institute v. United States,* 550 F.Supp. 1213 (D.D.C.1982), Judge Jackson of this Court perceived that the *Rose* first amendment inquiry resulted in no new approach by the federal courts. He stated that they had applied the government contacts exception by

simply discount[ing] the defendants' business activities in the District by the amount they involved getting information from or giving information to the government, or getting the government's permission to do something, which can only be done in Washington because that is where the government is.

*Id.* at 1216–17. Since seeking the government's aid for business reasons is in essence exercising one's commercial right of speech, which is clearly covered by the First Amendment, that Court did not find that *Rose* mandated a different result.

Judge Sirica's analysis of forum contacts in *Ramamurti v. Rolls Royce, Ltd.,* 454 F.Supp. 407 (D.D.C.1978), *aff'd,* 612 F.2d 587 (D.C.Cir.1980), is helpful. There, plaintiffs sued Rolls Royce, Ltd. for injuries sustained in a 1976 crash of an Indian Airlines plane in the Republic of India. The record reflected that defendant Rolls Royce was a corporation organized under English law, an instrumentality of the government of the United Kingdom with its principal place of business in London. Rolls-Royce, Inc. (RRI) is a wholly-owned subsidiary of Rolls-Royce Holdings North America Ltd., a Canadian corporation which itself is a wholly-owned subsidiary of the defendant Rolls-Royce. *Id.* at 409. An affidavit of RRI's District of Columbia manager stated that RRI provides "marketing information and service support for engines manufactured by Rolls Royce and sold by Rolls-Royce to operators within the United States." *Id.* The Washington, D.C. office also responded to various inquiries from federal agencies and in particular with respect to its sale of the Pegasus jet engine to the U.S. Marines. *Id.* at 410. The Court concluded,

[a]lthough RRI's central function here is not to solicit sales, and despite the local office's lack of authority to negotiate or enter into contracts of any kind, the fact remains that the RRI Washington office is not a legislative, lobbying, or diplomatic office, or one whose contacts with federal agencies touch uniquely governmental functions of the United States. Rather, RRI's operations in the District are

largely those "customarily associated with strictly commercial operations." Although some of the activities involve contacts with the government in its non-proprietary role (*e.g.*, furnishing of noise characteristics of Rolls-Royce engines to the FAA), Rolls-Royce does a substantial amount of business in the District which directly involves commercial contacts with the government as purchaser of Rolls-Royce products.

*Id.* at 412.

Based on its review of the cases which have interpreted the government contacts exception, the Court expresses some doubt that the exception was intended to apply in the manner sought here by Toyota. As the D.C. Court of Appeals in *Rose* explained, it was a principle which "emerged from a line of cases holding that employment of a Washington, D.C. correspondent and payment of his office rent did not expose a non-resident newspaper corporation to service of process in the District of Columbia." *Rose*, 394 A.2d at 1373 (citations omitted). The D.C. Court of Appeals in *Lockwood Greene* reasoned that it would be unfair to a defendant and a threat to this District to subject to personal jurisdiction every "non-resident whose *sole* contact with the District consists of dealing with a federal instrumentality." *Id.* at 813 (emphasis supplied). As the extent of a non-resident's contacts with this district increase, and include both governmental and private contacts, the force of the rule is lessened. In those cases, the appropriate approach is one of excluding from its calculus of contacts those that encompass dealings with the government because of its unique position. *See Investment Co. Institute*, 550 F.Supp. at 1216–17; *Siam Kraft*, 400 F.Supp. at 812. Even though the Court questions whether the protections to be afforded by the exception were intended to cover the extensive liaison, monitoring and lobbying activities of the Toyota office in this district, it finds that even by discounting them, Toyota is engaged in sufficient other private, commercial activities such that it can be held to be transacting business within the meaning of Section 12

of the Clayton Act. While the government contacts must be discounted, Toyota's participation in certain national and local private organizations need not be so precluded in this Court's view. Were those to be excluded, as Toyota urges, this District could never exercise personal jurisdiction over a defendant who had availed itself of the private organizations which have sprouted to be near the seat of government and have flourished precisely because this is the center of government. This would make a contacts with government contacts exception which is baseless.

### B.

### D.C. LONG ARM STATUTE

#### 1. TOYOTA'S COMMERCIAL CONTACTS WITH THE DISTRICT

TOYOTA'S WASHINGTON, D.C. OFFICE

Toyota Motor Corporation and its wholly-owned subsidiary, Toyota Motor Sales ("TMS/USA"), share a suite of offices in the District. TMS/USA leases the space and TMC sublets a portion of the space from them. (Deposition of Phillip Broman ("Broman Dep.") pp. 14–16.) Eighteen people work in that office; eight are employed by Toyota and ten by TMS. (Plaintiff's Ex. to Opposition to Motion to Dismiss ("Pl. Ex.") 37.). The logo on the wall in the hallway next to the office doors does not distinguish between the two offices but merely says, "Toyota." (Pl.Ex. 38.)

This office acts as a conduit with Toyota headquarters in Japan through its filing of monthly reports. These reports are divided into four categories: 1) Trends of Congress, the Government and Litigations; 2) Energy Trends; 3) Filing to NHTSA (National Highway Traffic Safety Administration/Enforcement Related; 4) Others. (Pl. Exs. 40, 42, 43.) The office engages in government and industry relations activities. (Brogan Dep., p. 9.) The office participates to varying extents in such automotive trade groups as the Japan Automobile Manufacturers Association (JAMA), the Automobile Importers Association (AIA)

(Deposition of Kunitaka Suzuki, p. 10), the National Automobile Dealers Association (NADA), and the American International Automobile Dealers Association (AIADA). The personnel of the TMS Washington office may attend both social and information gathering JAMA meetings (Broman Dep., 45). NADA and AIADA provide their dealer members with marketing services and counsel on industry relations matters on domestic and foreign car manufacturers, respectively (Pl.Exs. 46, 47). TMS makes charitable contributions to certain D.C. organizations through its "Toyota Fund" with the Community Foundation of Greater Washington, a tax exempt, charitable foundation incorporated in D.C. (Pl.Ex. 52). From the foregoing facts, one can see that Toyota reaps certain benefits from having an office located in the District. For the Court to assert personal jurisdiction over Toyota under Section 12, however, it must find that it sustains commercial activity here. This necessarily entails a finding of greater business involvement. For this reason, the Court must examine Toyota's commercial contacts with this district.[10] This necessarily involves inquiry into Toyota's role as the parent of subsidiaries TMS/USA and that subsidiary's control over Toyota distributorships since Toyota, itself, is not licensed to do business in the District. (Tsukada Aff. ¶ 2.) Since Chrysler seeks to premise personal jurisdiction over Toyota on the District of Columbia activities of William J. Usery who was hired by Arent, Fox on behalf of Toyota and GM as a labor consultant and the law firm of Arent, Fox, Kintner, Plotkin & Kahn, who handled the FTC investigation and otherwise represented TMC, the Court must also examine those contacts.

### 2. PARENT/SUBSIDIARY RELATIONSHIP

■ In order for a parent corporation to be amenable to suit in a particular district based on the activities of its subsidiary there, it must exercise a control rela-

tionship over its subsidiary. *Tiger Trash v. Browning Ferris Indus., Inc.*, 560 F.2d 818, 822 (7th Cir.1977), *cert. denied*, 434 U.S. 1034, 98 S.Ct. 768, 54 L.Ed.2d 782 (1978). Furthermore, despite a formal separation between parent and subsidiary, where the parent exercises continuing supervision and intervention in the subsidiaries' affairs, the subsidiaries' activities are attributable to the parent for Clayton Act venue purposes. *United States v. Scophony Corp.*, 333 U.S. at 814, 68 S.Ct. at 864.

■ A control relationship has been found if the parent is transacting business through its subsidiary. *Sunrise Toyota, Ltd. v. Toyota Motor Co.*, 55 F.R.D. 519, 529–30 (S.D.N.Y.1972). For example, a Japanese corporation and its American subsidiary were held to be a single entity for venue and jurisdiction purposes where they shared employees, presented a common image to the world through their advertising and the subsidiary was part of an integrated system of manufacture and sale. *Cascade Steel Rolling Mills, Inc. v. C. Itoh & Co.*, 499 F.Supp. 829 (D.Oregon 1980). Two cases reviewed by the Court have cumulated a list of factors generally considered by courts on this issue. In *Wells Fargo & Co. v. Wells Fargo Express Co.*, 556 F.2d 406 (9th Cir.1977), the Ninth Circuit Court of Appeals explained that a Court should consider

[w]hether the officers and directors of the two are the same; whether the subsidiary pays cash for products sold or service rendered to it by the parent; whether separate books, bank accounts, tax returns, financial statements and the like are kept; and whether the parent corporation holds the subsidiary out as an agent, either expressly or impliedly as by representing it as doing business in, or has an office in the state, when only the subsidiary is present.

*Id.* at 426 (citations omitted).

And in *Zenith Radio Corp. v. Matsushita Elec. Ind. Co., Ltd.*, 402 F.Supp. 262

---

**10.** Although the Court recognizes that the "transacting business" standard of Section 12 differs from the "transacting any business" standard of the D.C. long arm statute, Chrysler has relied on the same facts to support its argument on both statutes. For purposes of clarity the Court has set them forth in this section.

(E.D.Pa.1975), the District Court listed the following practical factors it had gleaned:

> the performance by the subsidiary or affiliate of business activities in a district, for example, sales and servicings, that in a less elaborate corporate scheme the absent corporation would perform directly by its own branch offices or agents. Another is a partnership in world-wide business competition between the absent corporation and the corporation that is present in a district. A third factor is the capacity of the absent corporation to influence decisions of the subsidiary or affiliate that might have antitrust consequences. Controlling stock ownership and interlocking directorates are, of course, indices of such a capacity. Yet another factor is the part that the subsidiary or affiliated corporation plays in the over-all business activity of the absent corporation. A fifth factor is the existence of an integrated sales system involving manufacturing, trading and sales corporations. A related factor is the status of the subsidiary or affiliate as a marketing arm of the absent corporation. A seventh factor is the use by the subsidiary or affiliate of a trademark owned by the parent. The transfer of personnel back and forth between the absent corporation and its subsidiary or affiliate is another factor that a court may properly consider. So is the presentation of a common marketing image by the related corporations. This is especially true when those corporations hold themselves out to the public as a single entity that is conveniently departmentalized either nationally or worldwide. Yet another factor is the granting of an exclusive distributorship by the absent corporation to its subsidiary or affiliate.

402 F.Supp. at 327–28 (citations omitted).

Chrysler has sustained its burden of demonstrating to the Court that such factors exist. TMS/USA is a wholly owned subsidiary of TMS. Six directors of Toyota form a majority of the 10-man TMS board. (Pl.Ex. 3) Toyota has selected the principal officers of TMS/USA in the past and employees have been transferred between Toyota and TMS although there is no rotational program *per se.* (Deposition of Yukiyasu Togo, p. 54.) Toyota may cancel TMS' rights as an importer in the event that the interests of the company are actually or possibly adversely affected by certain of the importer's activities. (Pl.Ex. 11, Article 13.) Toyota may send at any time a representative to TMS/USA if Toyota deems it necessary. (*Id.,* at Article 14.) Indeed, the monthly reports submitted by Toyota through discovery indicate that such visits occurred frequently. (See e.g. Pl.Exs. 40, 42, 43.)

TMS markets Toyota automobiles, parts and accessories in the United States through twelve regional distributorships. Mid-Atlantic Toyota Distributors, Inc. (MAT) serves the District of Columbia vicinity. TMS officers regularly visit these regional facilities and the area's dealerships to gain the distributors views of marketplace conditions. (Deposition of Robert A. McMillan, 68–71.) While all regional distributors are independent corporations and make their own pricing and marketing decisions, TMS and the distributors may ask the market representation department of TMS to assist them in market studies. (McMillan Dep. at 89–92.) While each Toyota dealer is afforded an opportunity to exercise its independence, an extensive Toyota Dealer Sales and Service Agreement governs the relationship between TMS as importer, the regional distributor and the dealer. Additionally, all dealers are authorized to use the single name, Toyota, in marketing their products. To become or continue as a Toyota dealer one must comply with the standards and criteria for dealer operations and disclose to TMS and the distributor certain business and personal information. (Pl.Ex. 13.) These arrangements demonstrate to the Court that there is the underlying unity of purpose and direction sufficient to find that these corporations, though separate, are all members of the larger Toyota family.

Within the MAT region, District 3 services the Metropolitan Washington, D.C. area, and includes dealerships in the Maryland

and Virginia suburbs. (Deposition of Joseph Burdis, 106–08.) Toyota does not maintain a dealership within the District itself since to do so would "be very massive and expensive in its proper fashion to service the customers." (*Id.* at 108–09.) The present network, in one official's estimate, does the job very admirably." (*Id.* at 109.) From the positioning of Toyota dealers around the area, it is clear that Toyota intends to penetrate this area's market; District of Columbia residents are thus not hampered in their ability to purchase Toyota automobiles nor to have a variety of conveniently located service facilities.

Additionally, the completion of automobile sales to D.C. residents requires Toyota dealers to arrange retail sales financing through D.C. banks, collect D.C. taxes payable by their purchasers, remit them to the District and provide D.C. title and tags to their purchasers. (Deposition of John F. Birch, 17–18.)

TMS encourages sales promotion in the District of Columbia by meeting with dealers at distributor-sponsored dinners (Pl.Ex. 22) and by participating in joint advertising with dealers during certain best selling periods. In 1983, TMS spent $315,140 for television commercials, $254,534 for radio commercials and $80,712 for newspaper advertising in the District of Columbia. (Pl.Ex. 30.) Certain advertising is accomplished through the Toyota Dealers Association to which TMS, distributors and dealers make contributions. *See, e.g.,* Pl.Ex. 32.

Based on the data presented, and its comparison with the factors set forth, *supra,* which courts have considered, this Court concludes that there is a unified heirarchy of Toyota corporations that transact business in the District of Columbia to satisfy Section 12. Through distinct corporate entities, which have but one ultimate master, Toyota has transacted business here.

*Scophony* has instructed that in applying Section 12, a court should not

> [atomize a defendants enterprise] into minute parts or events, in disregard of the actual unity and continuity of the whole course of conduct; ... there could be no valid object in expanding their pulverizing approach ... [m]ore especially would such an extension be inappropriate ... for, in cases against companies incorporated outside the United States, that extension would bring back all the obstacles to enforcement of antitrust policies and remedies which existed for domestic corporations before § 12 was enacted to give relief from these obstacles.

333 U.S. at 817, 68 S.Ct. at 866. Other federal trial courts have thus abandoned the day-to-day control test in favor of the more practical business concept approach, based on *Scophony's* reasoning. *See, e.g., Cascade,* 499 F.Supp. at 836–37; *Grappone, Inc.,* 403 F.Supp. 123, 131 (finding day-to-day control test inappropriate in antitrust suits); *Zenith Radio Corp.,* 402 F.Supp. at 319–20; *Hitt v. Nissan Motor Co., Ltd.,* 399 F.Supp. 838, 840–43 (S.D.Fla. 1945) [11] Toyota urges that this Court cannot properly exercise personal jurisdiction over Toyota when the District Court for the District of Maryland held that the District of Columbia federal court had no personal jurisdiction over MAT. *See In re Mid-Atlantic Toyota Antitrust Litigation,* 525 F.Supp. 1265 (D.Md.), *modified on other grounds,* 541 F.Supp. 62 (D.Md.1981), *aff'd sub nom, Pennsylvania v. Mid-Atlantic Toyota Distributors, Inc.,* 704 F.2d 125 (4th Cir.1983). In that case, four states and the District of Columbia brought separate antitrust actions against the MAT distribution and various automobile dealerships and others, alleging that they conspired to fix an artificially high price for polyglycoat finish applied to cars sold by defendants. The District of Columbia sought to exert the Court's personal jurisdiction over MAT based on D.C.Code

---

**11.** While the Court has employed this practical approach, it wishes to make clear that it has not based its decision on the aggregation of national contacts theory accepted by some courts and

presented to this Court by citation to *General Electric Co. v. Bucyrus-Erie Co.,* 550 F.Supp. 1037 (S.D.N.Y.1982).

§§ 13–423(a)(1) and (4). The District Court of Maryland found that plaintiff's mere allegation that MAT conducted business in the District of Columbia during the time when alleged price-fixing also occurred did not demonstrate that the former was in any way related to the latter. The failure to connect these two occurrences therefore precluded plaintiff's meeting the requirement set forth in D.C.Code § 13–423(b) that the claim for relief must arise from those of defendant's acts upon which personal jurisdiction is premised. The Court further found that since MAT had not actually sold cars in the District of Columbia it was not "transacting any business" in the District of Columbia under D.C.Code § 13–423(a)(1) and the price-fixing allegation had no foundation for § 13–423(b) purposes. *Id.* at 1276–77.

Were the gravamen of Chrysler's complaint only price-fixing against a Toyota distributor, Chrysler might be precluded, on the strength of *MAT,* from haling MAT into court here. Chrysler has not sued MAT, however, nor is it solely alleging price-fixing or seeking to premise jurisdiction solely on car sales in the District. The Court has found that Toyota is transacting business in the District for Section 12 purposes, in light of the cases which have also considered a parent's amenability to suit based on the acts of its subsidiary. Chrysler's gravamen is with the joint venture and on the basis of the record before it, Toyota has had sufficient contacts with this jurisdiction that are related to the joint venture for this Court to conclude that Toyota may properly be sued here.

### 3. ACTIVITIES OF TOYOTA'S EMPLOYEES AND AGENTS

### IN THE DISTRICT OF COLUMBIA

#### TOYOTA EMPLOYEES

Between April, 1982 and December, 1983, Toyota personnel visited the District of Columbia. By the early summer of 1982, Toyota officials visited Washington, D.C. to discuss the United States antitrust laws and other preliminary matters related to the joint venture. (Tsukada deposition at 1, 8–10.) On October 21st and 22nd, 1982, Toyota officials met to discuss the antitrust aspects of the draft Memorandum of Understanding (MOU). *Id.* at 35. In early February, 1983 Toyota and GM representatives met to discuss the draft MOU and finalize its language. *Id.* at 48–50.

#### RETENTION OF WILLIAM J. USERY

Toyota hired William Usery, president of Bill Usery Associates, Inc. (BUA), a labor management consulting firm, which is located in the District of Columbia. (Pl.Ex. 62.) Mr. Usery negotiated and concluded an agreement between the joint venture and the UAW. Toward that end, Mr. Usery held many meetings at his Washington, D.C. office and attended 35–40 meetings at the Arent, Fox offices. (Deposition of William J. Usery ("Usery Dep.") at 28.) He engaged in at least three days of meetings with a "delegation from Toyota." (*Id.* at 78–82.) He met with members of Toyota who were working on joint venture matters (*id.* at 139–40) and had four meetings with GM personnel in the District that related to the joint venture. (*Id.* at 143.) Although Mr. Usery did not seek the approval of Arent, Fox before releasing a statement to the press about the joint venture, he did provide them with a copy of his statement. *Id.* at 132–33. Mr. Usery represented Toyota, GM and the joint venture at all meetings and negotiations with the UAW. *Id.* at 50. Mr. Usery helped to prepare the written agreement with the UAW. *Id.* at 123. After Mr. Usery and Mr. Bieber, President of the UAW, had initialled the agreement, Mr. Usery travelled to Japan and Detroit to present the agreement to Toyota and GM to secure their approval. *Id.* at 149. After he obtained their approval, he received the "written authority of the principals" to discuss the labor aspects of the joint venture and to prepare for the FTC's investigation. *Id.* at 44–72.

#### ACTIVITIES OF ARENT, FOX

Toyota Motor Corporation retained the law firm of Arent, Fox, Kintner, Plotkin

and Kahn to render legal advice on all aspects of the joint venture, including the preliminary work toward securing the FTC's approval. (Kintner Deposition at 7.) Toyota sought legal advice on the corporate, antitrust, labor, and Congressional relations, as well as the federal, state and local tax aspects of the joint venture from Arent, Fox. *Id.* at 11–13, and 120, Arent, Fox was engaged in this work from late 1982 through 1983. *Id.* at 23. During this time, TMC came to Washington to discuss with Arent, Fox certain labor aspects of the joint venture. *Id.* at 14–15. Arent, Fox met as well on June 21, 1982 with GM's staff attorneys and GM's outside attorneys, members of the Jones, Day law firm to discuss the antitrust issues of the joint venture. Arent, Fox hired William Usery on behalf of Toyota and GM; Usery was paid by Toyota. *Id.* at 32–33. Usery testified that there was a three day meeting with Toyota staff present at the Arent, Fox offices. (Usery Dep. at 78–83.) The joint venture agreement was primarily negotiated by Toyota staff with General Motors staff; Arent, Fox's concern was with the antitrust aspects of the joint venture, primarily the pricing agreement of the joint venture and its parts (Kintner Dep. at 51–52, 68, 95.), although they did review drafts of the memorandum of understanding. *Id.* at 57–58. Mr. Colson, an Arent, Fox partner, advised Toyota on whether the joint venture should take the form of a corporation or a partnership. *Id.* at 79–80. Mr. Kintner prepared the first and second amendments to the Memorandum of Understanding extending the deadline for inclusion of a satisfactory labor structure. *Id.* at 91–92, 170. After receiving initial calls

referred to him from the FTC, Mr. Kintner informed Toyota that there was press interest in the joint venture and that he would be responding to the press. *Id.* at 40–41. Mr. Kintner testified that he did not have subsequent discussions with Toyota on the media coverage, but used his own judgment in responding to media inquiries. *Id.* at 42–45. Toyota paid for his time spent on this aspect of the case. *Id.* at 44.

### 4. APPLICATION OF LONG–ARM STATUTE

In viewing the volume of business to determine whether the defendant transacts business under Section 12, the transactions do not have to be related to the cause of action or the subject matter of the suit. *See In Re Chicken Antitrust Litigation,* 407 F.Supp. 1285 (N.D.Ga.1975). This is a proper inquiry under the local long arm statute, however. The Court has found that Toyota is transacting business in this forum under Section 12; it additionally finds that Toyota has availed itself of the benefits of this forum through its contacts on the joint venture and that those contacts satisfy the requirements of 13 D.C.Code § 423(a)(1).[12]

Under this section, a District of Columbia court may exercise personal jurisdiction over a person who acts directly or by an agent as to a claim arising from that person's transacting any business in D.C. *Willis v. Willis,* 655 F.2d 1333 (D.C.Cir. 1981). Chrysler seeks to premise this Court's personal jurisdiction over Toyota for this challenge to the joint venture based on Toyota's purposeful exploitation of the District of Columbia market,[13] and

---

12. The Court does not find personal jurisdiction based on tortious injury in the District. There is no evidence that plaintiff has suffered a tortious injury in this district as compared with any other district at this stage. While Chrysler has stated a claim of threatened injury sufficient to withstand a motion to dismiss, it has not yet sustained an injury that is a predicate for invoking this section of the long arm statute.

13. The parties have dubbed this the "stream of commerce" argument, based on the Supreme Courts statement in *World Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980), that the forum state does not exceed its powers under the Due Process Clause if it exercises personal jurisdiction over a corporation "that delivers its products into the stream of commerce with the expectation that

based on TMC's transacting business [14] here alone or through its subsidiary, TMS, or its agents, Arent, Fox and William J. Usery.

Toyota maintains that for the Court to apply the *World-Wide Volkswagen* analysis to this case, Chrysler would have to base its claim on goods that have already found their way into this jurisdiction. According to Toyota, since Chrysler is alleging injury from the joint venture vehicle which has not yet even been produced, much less even sold to a District of Columbia resident, Chrysler is in their words seeking to enjoin a future stream of commerce. The Court has not based its ruling on the stream of commerce concept.[15] The Court finds that the basic inquiry, also stated in *World-Wide Volkswagen*, is whether "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *Id.* at 297, 100 S.Ct. at 567 (citations omitted).

■■■ In *Cohane v. Arpeja-California, Inc.*, 385 A.2d 153 (D.C.), *cert. denied*, 439 U.S. 980, 99 S.Ct. 567, 58 L.Ed.2d 651 (1978), the D.C. Court of Appeals explained that,

> Under § 13–423(a)(1), less of a nexus between the defendant and the District of Columbia is required for a finding of jurisdiction than would be required under the "doing business" test used to determine corporate presence. All that is required is some affirmative act by which the defendant brings itself within the jurisdiction and establishes minimum contacts.

*Id.* at 158 (citations omitted). Those contacts must represent a deliberate and voluntary association with the forum. *See Mouzavires v. Baxter*, 434 A.2d 988, 997 (D.C.1981), *cert. denied*, 455 U.S. 1006, 102 S.Ct. 1643, 71 L.Ed.2d 875 (1982). A de-

fendant's affiliations with the forum should be of a quantity and quality sufficient to demonstrate a purpose to obtain the benefits and protections of the forum. *Frank E. Basil Co. v. Guardino*, 424 A.2d 70, 75 (D.C.1980); *cf. Stabilisierungsfonds Fur Wein v. Kaiser Stuhl Wine Distrib.*, 647 F.2d 200, 205 (D.C.Cir.1981).

■■■ The long arm statute does require, however, that the suit arise from, or have a nexus with the claim asserted. *Berwyn Fuel, Inc. v. Hogan*, 399 A.2d 79, 80 (D.C. 1979) (holding that D.C. local court had no personal jurisdiction over defendant fuel company, which made deliveries in D.C., when plaintiff's tort claim arose from collision with fuel truck in Maryland). It is clear, however, that once the claim is related to acts in the District, the long arm statute does not require that the scope of the claim be limited to activity within this jurisdiction. *Cohane, supra*, at 158–59. Thus in *Cohane*, since the District of Columbia had personal jurisdiction over defendant clothing manufacturer who sold suits in the District, it could also entertain plaintiff salesman's claims for commissions earned in three nearby states included in his selling region.

Toyota contends that the meetings, with counsel present, focused on legal rather than business issues and hence that these do not satisfy the "transacting any business" requirement of the long arm statute. The record reflects that there were extensive preparatory meetings in the District to discuss the legal implications of the joint venture. The significant legal ramifications of the joint venture have been recognized by the parties and the FTC. This particular aspect of Toyota's business necessitated extensive legal analysis; without that analytical foundation, no venturing would have been possible. The Court therefore does not find that distinction dis-

---

they will be purchased by consumers in the forum state." *Id.* at 299, 100 S.Ct. at 568.

**14.** As the Court discussed *supra,* it has not included Toyota's government contacts in this analysis.

**15.** Although interesting, at least one court has predicted that that argument would preclude a plaintiff from seeking anticipatory injunctive relief. *See Sybron Corp. v. Wetzel,* 46 N.Y.2d 197, 204, 385 N.E.2d 1055, 413 N.Y.S.2d 127, 131 (1978).

positive of the issue. *See Myers v. American Dental Ass'n,* 695 F.2d 716, 728, 730 (3rd Cir.1982), *cert. denied,* — U.S. —, 103 S.Ct. 2453, 77 L.Ed.2d 1333 (1983). The record further reflects that Toyota transacted that joint-venture related business by engaging certain of its own employees and agents in this District to accomplish the different components of the joint venture. *See Snyder v. Hampton Industries,* 521 F.Supp. 130, 142–43 (D.Md. 1981). Upon consideration of the record and case law cited *supra,* the Court finds that Toyota has affirmatively and purposefully associated itself with this forum such that it would not offend due process for it to be subject to suit in this district.

## SERVICE OF PROCESS

When venue is properly laid in a judicial district under Section 22 extraterritorial service of process running from the district where the action was filed to wherever the corporation may be found, including foreign countries, is proper. *Zenith Radio Corp.,* 402 F.Supp. at 329–30. Toyota was served a copy of the summons and complaint at its corporate headquarters in Japan, by registered mail, return receipt requested, on March 20, 1984; the return was received on March 30, 1984. This Circuit has held that

> ... [S]ervice of process from the United States into a foreign country by registered mail may thus be viewed as the least intrusive means of service—i.e., the device which minimizes the imposition upon the local authorities caused by official U.S. government action within the boundaries of the local state.

*F.T.C. v. Compagnie De Saint-Gobain-Pont-A-Mousson,* 636 F.2d 1300, 1313 & n. 68 (D.C.Cir.1980). Specifically, the government of Japan has not objected to subsection (a) of Article 10 of the Hague Convention, 20 U.S.T. 361, 363, T.I.A.S. No. 6638, 658 U.N.T.J. 163. That subsection provides that the state of destination does not object to, "(a) the freedom to send judicial documents, by postal channels, directly to persons abroad, ..." *Id.* The service of the

summons and complaint via this method is proper. *Shoei Kako Co. v. Superior Court,* 33 Cal.App.3d 808, 821–22, 109 Cal. Rptr. 402, 411–12 (1973).

Accordingly, it is this 29th day of May, 1984,

ORDERED that the motions of General Motors and Toyota to dismiss for failure to state a claim are DENIED and the motion of Toyota to dismiss based on venue, personal jurisdiction and service of process grounds is DENIED.